## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **Ancra International LLC,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.: |
| v. | : | |
| | : | |
| **Kinedyne Corporation and Ralph Abato,** | : | |
| | : | |
| Defendants. | : | April 24, 2012 |
| | : | |
| | : | |

## COMPLAINT

Plaintiff Ancra International, LLC ("Ancra"), by and through its undersigned counsel, file this Complaint against Kinedyne Corporation ("Kinedyne") and Ralph Abato ("Abato") (collectively "Defendants") for injunctive relief and damages as follows:

### PRELIMINARY STATEMENT

Ancra, a world-class leader in the area of cargo handling and restraint systems, brings this action against Kinedyne, a direct competitor in a highly competitive industry, and Abato, a former Vice President of International Sales of Ancra. In June 2000, Ancra hired Abato as a Vice President of Sales and Marketing and, on October 1, 2011, appointed Abato as Ancra's Vice President of International Sales. Both as a Vice President of Sales and Marketing and as Vice President of International Sales, Abato had access to highly confidential, high-level global strategic planning, marketing, product design, financial and other proprietary Ancra information.

Shortly after his appointment as Vice President of International Sales, Abato began engaging, and for the next four and one-half months he continued to engage, in a far-reaching pattern of intentional, egregious and illegal conduct against Ancra, including but not limited to, secretly plotting with Kinedyne's President and Chairman of the Board, its Executive Vice

President and other high level Kinedyne executives to promote and develop a proprietary product design concept, which was first developed by and belongs to Ancra, as a competing product and thereby usurping Ancra's corporate opportunity; forwarding to his personal email account proprietary and confidential Ancra information including but not limited to financial, product, and customer information; soliciting two other Ancra employees, Paul Wolford ("Wolford") and Mark Arnold ("Arnold"), to leave Ancra to join him at Kinedyne; upon information and belief, forwarding to his personal email account and to Wolford's and Arnold's personal email accounts, files labeled "ancra systems bv/Loadrunner," which, upon information and belief, contained highly confidential and proprietary information on Ancra's confidential and proprietary product design concept that Kinedyne and Abato intended to steal and secretly collaborate to develop; and deleting his company email and Ancra computer data in an attempt to cover up his illegal and anticompetitive activity.  Abato, Wolford and Arnold coordinated their resignations and suddenly and without prior notice left Ancra on March 2, 2012.  Ancra continues to investigate Wolford's and Arnold's involvement in this anticompetitive scheme and reserves its right to sue them individually.

Ancra first began pursuing this extremely confidential and proprietary new product design concept with which Abato was directly involved in or around March of 2011. In furtherance of this new product design concept, Ancra sent Abato to the Netherlands and on December 1, 2011, in his capacity as Vice President of International Sales, Abato met with representatives from Ancra Systems B.V., including but not limited to Jasper van den Driest, with whom Ancra intended to develop this concept. (Ancra Systems B.V. is licensed to use the "Ancra" name but is otherwise unaffiliated with Ancra.)

A little over a month before this planned trip to the Netherlands on behalf of Ancra,

2.

Abato contacted James M. Klausmann, the President and Chairman of the Board of one of Ancra's major competitors, Kinedyne, to entice Kinedyne to develop this very same product concept—in essence, to steal the Ancra product concept that was under development. Abato, an officer of Ancra, thereby became a corporate spy. Abato was traveling on behalf of Ancra and at Ancra's expense, ostensibly to develop a product design for Ancra, while he was simultaneously pitching this same concept to Kinedyne with the intent of competing with Ancra. Kinedyne actively engaged in and promoted Abato's anticompetitive conduct and engaged in a protracted series of secret communications and meetings to develop this competing product – all while Abato remained an officer of Ancra.

Abato's theft and covert development with Kinedyne of this proprietary new product is a prime example of the far-reaching pattern of intentional, egregious and illegal conduct engaged in by Abato against Ancra starting shortly after his appointment as Vice President of International Sales and continuing for the next four and one-half months.

In addition to violating his contractual and fiduciary obligations to Ancra, Abato's egregious anticompetitive conduct violated and continues to violate numerous state and federal laws. Likewise, the anticompetitive conduct of Kinedyne's high ranking executives violates numerous state and federal laws. Ancra therefore seeks injunctive relief against, and damages from, Defendants, including but not limited to an accounting of the information and materials, electronic or in hard copy, misappropriated by Defendants, forfeiture of Abato's salary, compensation and bonuses during the period of disloyalty, compensatory damages for breach of contract, attorneys' fees and costs, and punitive and treble damages.

## **THE PARTIES**

1.      Plaintiff Ancra International, LLC is a Delaware limited liability corporation with

3.

its principal place of business at 875 W. 8<sup>th</sup> Street, Azusa, California 91702. The Cargo Division of Ancra, for which Abato, Wolford and Arnold worked, has its principal place of business at 2685 Circleport Drive, Erlanger, Kentucky 41018.

    2.      Defendant Kinedyne Corporation is a Delaware corporation with its principal place of business at 151 Industrial Parkway, Branchburg, New Jersey 08876.

    3.      Defendant Ralph Abato is an individual residing at 29 Ten Acre Road New Britain, CT 06051.

<div align="center">

**JURISDICTION AND VENUE**

</div>

    4.      The Court has federal question jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 because Ancra asserts a cause of action against Defendants under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and Ancra's state law claims form part of the same case or controversy.

    5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Ancra's claims occurred within the jurisdiction of this Court.

    6.      Defendants are subject to personal jurisdiction in Connecticut and this district because they have engaged in substantial and not isolated activities in Connecticut and this district and committed tortious acts within Connecticut and this district.

<div align="center">

**FACTS**

</div>

**Ancra International, LLC**

    7.      Ancra is a world-class leader in the area of cargo handling and restraint systems by providing quality products on time with the greatest value to its customers. Ancra designs

<div align="center">

4.

</div>

and manufactures cargo handling solutions for many different industries, including aircrafts and commercial trucking.

8.      Ancra's trade secrets, proprietary and confidential information, and customer relationships have significant economic value to Ancra, and Ancra has a legitimate business interest in keeping such information confidential, in maintaining its business goodwill and customer relationships, and not allowing its trade secrets and other confidential and proprietary information to be disclosed to its competitors through any improper means.

9.      Ancra's trade secrets, confidential information, employee relationships, and customer relationships would be of significant economic value to Ancra's competitors, including Kinedyne.

**Kinedyne Corporation**

10.     Kinedyne directly competes with Ancra, offering competitive products and services in the same service and marketing areas in which Ancra conducts business.

**Abato's Positions and Duties at Ancra**

11.     In June 2000, Ancra hired Abato as a Vice President of Sales and Marketing and, on October 1, 2011, appointed Abato as Ancra's Vice President of International Sales. As a Vice President of Sales and Marketing and as Vice President of International Sales, Abato was in a position to regularly handle and become familiar with confidential and proprietary information and trade secrets concerning operations of Ancra that could be used to gain an unfair competitive advantage in competition with Ancra, including financial performance and projections, strategic plans, technical data, discoveries, product information, marketing information, customer order history and customer contact information. For example, the week before Abato resigned from Ancra, Abato attended Ancra's strategic planning meetings and was privy to discussions

5.

concerning acquisitions and potential acquisitions, financial data, pricing and strategic planning. Moreover, Abato worked regularly and directly with Ancra's customers on an ongoing basis. Ancra has acted reasonably and diligently to keep secret the types of information described above, because it is economically valuable and derives economic value from not being known to Ancra's competitors, including Kinedyne.

**Abato Pitches Ancra's New Product Design to Kinedyne and Engages in Double-Dealing**

12.   In or around March 2011, Ancra began pursuing an extremely confidential and proprietary new product design concept.  Abato was directly involved with developing this confidential new product design concept.  Abato was privy to confidential and proprietary Ancra information concerning Ancra's new product design.  Abato knew that such information would be of extreme value to Kinedyne.

13.   On October 26, 2011 – less than a month after Ancra appointed Abato Vice President of International Sales, which was a different position than Abato had sought for himself – Abato emailed James Klausmann, Chairman and President of Kinedyne, and stated:

> Jim, you and I don't know eachother [sic] very well after all these years.  Perhaps it is time we talked.  As you may know there have been changes within our organization, most feel not for the best.  Management made some decisions a little over a year and a half ago, and now we have an extremely divided team and I am exploring opportunities to rectify this.  I am not looking for a job, *but looking at Global Industry wide opportunities that may benefit us both.*  If you have interest, let me know via this e-mail address.  I am in Brazil right now and have several International trips planned over the next 7 weeks.  If you are in the US, I am sure we can find a mutual meeting place, if not soon, than right after the first.  I am contacting you and not Jamie at this point, not to exclude him, but I feel he is very close to the day to day business, and I want to discuss the broader picture with you initially.  You can then decide if it makes sense to go further.  Of course at this point, this is strictly confidential."

A copy of the October 26, 2011 email is attached as Exhibit A to this Complaint and incorporated herein by reference.

14.    On November 1, 2011, James Klausmann responded to Abato's email, expressing an interest in Abato's proposal, stating "I totally understand the need to keep this very confidential." Id.

15.    After contacting Kinedyne with Ancra's proprietary, confidential product concept currently under development, Abato traveled to the Netherlands in his capacity as Vice President of International Sales for Ancra.  Abato knew he would be traveling to the Netherlands on behalf of Ancra prior to contacting James Klausmann on October 26, 2011, as he booked his flight on October 20, 2011.  Thereafter, on December 1, 2011, Abato met with representatives of Ancra Systems B.V. a/k/a Ancra Netherlands ("Ancra Netherlands"), including but not limited to Jasper van den Driest ("Van Den Driest"), to discuss the development of this concept, known to Ancra as "Loadrunner." (Ancra Netherlands is licensed to use the Ancra name but has no current corporate affiliation with Ancra, having been sold by Ancra in 1997.)

16.    In Abato's trip report to Steve Frediani and Tom Leone, both Ancra executives, Abato reported that Ancra Netherland's representative Van Den Driest wanted to pursue a joint venture and invest in a prototype system to market in the United States.  Abato reported that Ancra would need to have the prototype in place for early 2013.  Abato also reported there were numerous potential customers for the new "Loadrunner" product.  A redacted copy of Abato's trip report is attached as Exhibit B to this Complaint and incorporated herein by reference.

17.    Following his meeting with Ancra Netherlands representatives, in a series of email exchanges with various Ancra executives on or about December 8, 2011, Abato wrote that Van Den Driest had expressed concerns over how Ancra's potential acquisition of one of Ancra Netherlands's competitors would affect the development of the "Loadrunner" system.   A redacted copy of this email correspondence is attached as Exhibit C to this Complaint and

incorporated herein by reference.

18.     Ancra employee Jon Hicks ("Hicks"), who was overseeing the potential acquisition, replied that Ancra could do "whatever makes sense" for Ancra, including withdrawing the bid. Id.

19.     Abato's reply to Hicks reiterated Van Den Driest's concern. Abato did not address Hicks' offer to withdraw the bid. Id.

20.     Rather than continue to develop the "Loadrunner" for Ancra, Abato redoubled his efforts to develop the product with Kinedyne.

21.     Upon information and belief, on or around January 12 and/or January 15, 2012, Abato used his Ancra computer to send a file labeled "ancra systems bv/Loadrunner" to his personal email address, Mark Arnold's personal email address, and Paul Wolford's personal email address.  Wolford is Ancra's former Director of Engineered Solutions, and Arnold is Ancra's former Manager of Process Improvement, Engineered Solutions.  Upon information and belief, this email contained highly confidential and proprietary Ancra information concerning the proposed new product Abato was secretly and wrongfully collaborating with Kinedyne to develop.

22.     On January 18, 2012, James Klausmann II, Executive Vice President of Kinedyne, emailed Abato to discuss the marketing strategy and framework of setting up a competing venture with Ancra, involving Ancra Netherlands.  Specifically, Klausmann II stated in relevant part:

> Wanted to drop you a line to let you know I did not forget about you.  After reviewing all of the information I had available to me, principally from the Ancra Netherlands website, I was able to answer many of my general questions.  What remains to be discussed is: detailed review of the new proprietary auto loading system; an understanding of the basic framework for the licensing/sales/mfg agreement Jasper is proposing; an understanding from Jasper as to his

8.

expectations of us as a licensee; a rough time line from your/Jaspers perspective of the milestones and action items required to make a successful launch of the system in NA; a rough sales/go to market strategy and time line to include list of principal challenges/hurdles in our market. I have yet to email Jasper directly as it seems a bit awkward. If you have a few minutes tomorrow maybe we could find time to discuss.

A copy of the January 18 email is attached as Exhibit D to this Complaint and incorporated herein by reference.

23.     Upon information and belief, Abato met with James Klausmann, Kinedyne's Chairman of the Board and President, and James Klausmann II, Kinedyne's Executive Vice President, and Van Den Driest, a representative of the Ancra Netherlands, on or around Sunday, January 22, 2012, to discuss Ancra's proprietary information and trade secrets, including but not limited to the development of "Loadrunner", which they had now decided to name "LoadmatiK", with the ending "K" for Kinedyne. See id.

24.     As part of this email correspondence, Abato and the Kinedyne senior officers discussed a "detailed review of the new proprietary auto loading system." Abato suggested to James Klausmann and James Klausmann II that they enter into a joint venture to develop "LoadmatiK." Id.

25.     On January 23, 2012, James Klausmann II emailed Abato and copied James Klausmann, stating:

> My father and I were equally impressed with Jasper and the opportunity. We will continue to discuss and evaluate location options for the prototype and be prepared to speak to our recommendations during our next meeting. In the mean time we will await Jaspers review with his team and hopefully a letter of intent. I was out of the office Friday afternoon and did not receive your voicemail until this morning. I assume that we covered the open issues you wanted to discuss during our meeting. If not, feel free to give me a call when convenient.

Id.

26.     James Klausmann II followed up this email on the same day with another email to

Abato, stating: "Forgot to mention I like your thought regarding LoadmatiK." Id.

27.     Upon information and belief, the "LoadmatiK" product Abato and Klausmann referred to is the same proposed product that Abato was supposed to be developing for Ancra when he was meeting with Ancra Netherland's representative Van Den Driest on December 1, 2011.  Instead, as evidenced by Defendants' email correspondence, Abato was secretly and wrongfully developing the "Loadrunner" or "LoadmatiK" product for Kinedyne along with Van Den Driest.

28.     On February 2 and 3, 2012, Abato engaged in email correspondence with Amy Bellerive, the Human Resources Manager for Kinedyne.   The subject of this email correspondence was "Kinedyne Offer."   Upon information and belief, this correspondence related to Kinedyne's offer of employment to Abato.

29.     On February 7, 2012, Abato contacted Steve Atzeni, Vice President of North American Operations at Kinedyne, in furtherance of the illegal, anticompetitive conduct.

30.     As further evidence of disloyal preparatory conduct on Abato's part, Abato also forwarded many emails from his Ancra email address to his personal email address.  The emails contained Ancra's highly confidential information and proprietary information, including Ancra's financial and operating results, proprietary product drawings and product information, customer orders, internal communications concerning customer concerns, and customer contact information.

31.     As further evidence of Abato's knowledge of the wrongfulness of his actions, and as further evidence of his deliberate actions to cover up his wrongful acts, on February 27, 2012, Abato sent Perry Criscuolo, another Ancra employee who, upon information and belief, was seeking advice from Abato on Criscuolo's own resignation from Ancra in February 2011, an

10.

email telling Criscuolo to delete from his sent emails folder an email Criscuolo had forwarded to his personal email address and to Abato on February 26 containing Criscuolo's customer contacts.

32. After secretly communicating and cooperating with Kinedyne, a direct competitor of Ancra, for more than four months, Abato suddenly and without notice resigned his employment with Ancra on or about March 2, 2012 and formally began his employment with Kinedyne.

**Abato's Soliciting Ancra Employees to Work for Kinedyne**

33. On the same date Abato resigned from Ancra, March 2, 2012, Paul Wolford, Ancra's Director Engineered Solutions, and Mark Arnold, Ancra's Manager Process Improvement, Engineered Solutions, suddenly and without prior notice both resigned their employment with Ancra and joined Abato as employees of Kinedyne.

34. In a January 18, 2012, email from James Klausmann II to Ralph Abato, Klausmann states: "Regarding a meet and greet discussion with Mark and Paul will you find out if they can be available at 6:00 EST either Wed or Thur of next week?" See Exhibit D.

35. On February 4, 2012, Abato engaged in email correspondence with Wolford. The subject of this email correspondence was "Kinedyne Offer, Follow up."

36. Upon information and belief, Abato solicited Paul Wolford to work for Kinedyne, as explicitly prohibited by Abato's contractual obligations to Ancra.

37. Upon information and belief, Abato solicited Mark Arnold to work for Kinedyne, as explicitly prohibited by Abato's contractual obligations to Ancra.

**Abato's Contractual Obligations to Ancra**

38. On or about June 7, 2000, and as a condition of his affiliation with Ancra, Abato

entered into a written agreement with Ancra, whereby Abato agreed to serve as a Vice President of Sales and Marketing on behalf of Ancra. The written agreement between Ancra and Abato is entitled "Employment Agreement." A copy of the Employment Agreement is attached as Exhibit E to this Complaint and incorporated herein by reference.

39. On or about June 9, 2000, and as a condition of his affiliation with Ancra, Abato entered into a second written agreement with Ancra. This second written agreement between Ancra and Abato is entitled "Employee Proprietary Information and Inventions Agreement" ("Proprietary Information Agreement"). A copy of the Proprietary Information Agreement is attached as Exhibit F to this Complaint and incorporated herein by reference.

40. In October 2011, Abato was appointed Ancra's Vice President of International Sales. As both the Vice President of Sales and Marketing and Vice President of International Sales with Ancra, Abato was provided with Ancra's trade secrets and proprietary and confidential information, and he worked directly with Ancra's customers.

41. In the Employment Agreement and Proprietary Information Agreement (collectively "Agreements"), Abato expressly recognized and acknowledged that in the course of performing his work on behalf of Ancra, he would be given confidential information and trade secrets belonging to Ancra, and that he had an obligation to maintain the confidentiality of such information. Specifically, Abato acknowledged in the Employment Agreement that:

> At all times, both during the Employment and after the cessation of the Employment, whether the cessation is voluntary or involuntary for any reason, or by disability, *Employee will keep in strictest confidence and trust all Proprietary Information, and Employee will not disclose, use, or induce or assist in the use or disclosure of any Proprietary Information without the prior express written consent of Ancra*, except as may be necessary in the ordinary course of performing Employee's duties as an employee of Ancra. Employee recognize [sic] that Ancra has received and in the future will receive from third parties their confidential or proprietary information subject to the duty on Ancra's part to maintain confidentiality of such information and to use it only for certain limited

12.

purpose. *Employee agrees that Employee owes Ancra and such third parties, during the Employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence, and Employee will not disclose, use or induce or assist in the use or disclosure of any such confidential or proprietary information without the prior express written consent of Ancra,* except as may be necessary in the ordinary course of performing Employee's duties as an employee of Ancra consistent with Ancra's agreement with such third party.

Exhibit E, pg. 4 paragraph 10(e) (emphasis added). Abato also agreed that he would not

"directly or indirectly engage in any activity that Ancra shall determine in good faith to be in

competition with Ancra." Id. at paragraph 11.

42.     The Employment Agreement also provided:

In the event of the cessation of the Employment, Employee will deliver to Ancra all devices, records, sketches, reports, proposals, lists, correspondence, equipment, documents, photographs, negatives, undeveloped film, notes, drawings, specifications, tape recordings or other electronic recordings, programs, data and other materials or property of any nature belonging to Ancra or pertaining to Employee's work with Ancra, and Employee will not take with him, or allow a third party to take, any of the foregoing or any reproduction of any of the foregoing.

Id. at paragraph 10(f).

43.     Abato explicitly consented to injunctive relief in the event of any violation of the

Employment Agreement, acknowledging that:

for the breach of any covenants contained in this Agreement, and particularly Paragraphs 10 or 11, *Ancra will suffer irreparable damages for which the remedy at law will be inadequate, and that an injunction may be entered against Employee* by any court having jurisdiction, restraining Employee from breaching or continuing the breach.

Id. at paragraph 12 (emphasis added).

44.     Abato acknowledged in the Proprietary Information Agreement that:

At all times, both during my Employment and after the Cessation of my Employment, whether the Cessation is voluntary or involuntary for any reason or no reason, or by disability, I will keep in the strictest confidence and trust all Proprietary Information, and I will not disclose, use or induce or assist in the use

13.

or disclosure of any Proprietary Information without the prior express written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty of the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree that I owe the Company and such third parties, during my Employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence, and I will not disclose, use, or induce or assist in the use or disclosure of any such confidential or proprietary information without the prior express written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company consistent with the Company's agreement with such third party. I UNDERSTAND AND AGREE THAT, AS FURTHER PROVIDED FOR HEREIN, THIS CLAUSE SHALL CONTINUE IN FULL FORCE AND EFFECT AFTER TERMINATION OF MY EMPLOYMENT.

Exhibit F at paragraph 3.

45.     Abato further agreed that:

In the event of the cessation of the Employment, I will deliver to the Company all devices, records, sketches, reports, proposals, lists, correspondence, equipment, documents, photographs, photostats negatives, undeveloped film, notes, drawings, specifications, tape recordings or other electronic recordings, programs, data and other materials or property of any nature belonging to the Company or pertaining to my work with the Company, *and I will not take with me, or allow a third party to take, any of the foregoing or any reproduction of any of the foregoing.*

Id. at paragraph 5 (emphasis added).

46.     Abato acknowledged that Proprietary Information is defined in the Employment

Agreement as:

[I]nformation not generally available to the public that has been created, discovered, developed, or otherwise become known to Ancra or in which property rights have been assigned or otherwise conveyed to Ancra, which information has material economic value or potential material economic value to the business in which Ancra is or will be engaged. Proprietary Information shall include, but not be limited to, trade secrets, processes, formulas, data, know-how, negative know-how, improvements, discoveries, developments, designs, inventions, techniques, all technical data, customer and supplier lists, and any modifications or enhancements thereto, software programs, and information (whether or not necessarily in writing) which has actual or potential economic value to Ancra.

14.

Exhibit E at paragraph 10(a). The definition of Proprietary Information set forth in the

Proprietary Information Agreement is in relevant part the same. See Exhibit F, Exhibit A thereto

(hereinafter "Proprietary Information" refers to the definition sets forth in the Agreements).

47.    Abato further agreed that:

> During the period of my Employment, I will not directly or indirectly engage in
> any activity which the Company shall determine in good faith to be in
> competition with the Company. During any Employment and for a period of two
> (2) years after the Cessation of my Employment, I will not, either directly or
> indirectly, either alone or in concert with others, solicit or entice any employee of
> or consultant to the Company to leave the Company or work for anyone in
> competition with the Company or solicit, entice or in any way divert any customer
> or supplier to do business with any business entity in competition with the
> Company. *During my employment, I agree not to plan or otherwise take any
> preliminary steps, either alone or in concert with others, to set up or engage in
> any business enterprise that would be in competition with the Company.*

Exhibit F, paragraph 4 (emphasis added).

48.    Ancra expended substantial time, expense, and resources in developing and

supporting Abato in the course of his affiliation with Ancra. Ancra also placed Abato in direct

contact with its customers, and confided to him its confidential and proprietary information.

**Post-Employment Events and Ancra's Forensic Investigation**

49.    On March 5, 2012, Ancra wrote to Abato and reminded him of his contractual

obligations under the Agreements. A copy of the March 5 correspondence is attached as Exhibit

G to this Complaint and incorporated herein by reference.

50.    On March 8, Abato replied to Ancra stating:

> I have received the agreements which you referenced in your letter dated March 5.
> I am writing you to confirm that I have returned to Ancra all company property as
> well as confidential and proprietary information. Mr. Tom Leone should now be
> in receipt of those items. I also confirm that I will continue to comply with my
> confidentiality obligations.

A copy of the March 8 correspondence is attached as Exhibit H to this Complaint and

incorporated herein.

51.    On March 16, 2012, counsel for Ancra again wrote to Abato reminding him of his contractual obligations to Ancra.  A copy of the March 16 correspondence is attached as Exhibit I to this Complaint and incorporated herein by reference.   Abato did not respond to this correspondence.

52.    Notwithstanding Abato's representations in his March 8 email to Ancra, and his contractual, statutory, and common law obligations not to use or disclose Ancra's confidential information and trade secrets, not to solicit Ancra's employees, or to otherwise improperly compete with Ancra, Abato had been engaging in an ongoing course of conduct that violated the terms of his contractual obligations to Ancra under the Agreements.

53.    When Ancra forensically examined Abato's business computer following his sudden and unexpected resignation, which included forensic recovery of, among other things, deleted company email and fragments of personal webmail (Yahoo! email) that were retained on his Ancra computer, Ancra discovered that over a period of approximately four months Abato engaged in a series of email correspondence and in-person meetings with the most senior officers at Kinedyne evidencing Defendants' intent to engage in unfair competition and misappropriation of Ancra's proprietary information and trade secrets, and to usurp a corporate opportunity rightfully belonging to Ancra under the terms of Abato's contractual obligations with Ancra.

54.    Ancra discovered that on several occasions dating back to October 2011, Abato attached multiple external storage devices with extensive data capacity to his Ancra computer, including two which, upon information and belief, were 1TB external drives.  In fact, Abato last attached a 1 TB external storage device to his Ancra laptop on February 27, 2012 – only five days prior to his sudden and unexpected resignation.  Upon information and belief, Abato used

16.

these external storage devices to misappropriate Ancra's highly confidential information, Proprietary Information and trade secrets, including but not limited to financial and operating information, design schematics, customer and marketing information, and pricing information. Abato did not have authorization to copy any of Ancra's data, Proprietary Information or trade secrets to external storage devices for his own personal use.

55.     Upon information and belief, Abato has wrongfully and intentionally failed to return said highly confidential information and Proprietary Information.   Abato has not surrendered any external storage devices or returned any Proprietary Information to Ancra.

56.     Upon further examination, Ancra discovered that Abato also deleted numerous files from his computer prior to his resignation.   Such files contained Ancra's Proprietary Information and trade secrets.   Abato also deliberately deleted all of his email off his Ancra computer, including all archived email, all subfolder email, all sent email and all deleted email.

57.     By deleting these files and emails, Abato intentionally destroyed evidence (engaged in spoliation of evidence), and wrongfully destroyed, deleted, removed and/or made inaccessible to Ancra its Proprietary Information and trade secrets.

58.     Abato's actions evidence a methodical, long-term plan to secretly misappropriate Ancra's confidential and proprietary information for his personal benefit and the benefit of his new employer, Kinedyne, and to conceal his egregious wrongdoing.

59.     Subsequent to Wolford and Arnold's resignation, Ancra discovered both Wolford and Arnold connected multiple external storage devices (including, upon information and belief, 500GB or 1TB external drives) to their Ancra computers on several occasions in the weeks leading up to their resignations.  In fact, Arnold last attached a 500 GB or 1 TB external storage device to his Ancra laptop on March 1, 2012 – the day before his abrupt resignation.    Upon

17.

information and belief, Wolford and Arnold used said storage devices to copy Ancra's proprietary and confidential information and trade secrets from their Ancra computers.

60.    As further evidence of their disloyal and improper actions, and as further evidence of the concerted and coordinated effort among the Defendants and Wolford and Arnold to engage in anticompetitive and illegal conduct and to cover up such conduct, Wolford and Arnold also deliberately deleted (as Abato had done) all network email before resigning, including all archived email, all subfolder email, all sent email, and all deleted email.

61.    Prior to his resignation, Abato disparaged Ancra to Ancra's customers.  Upon information and belief, prior to his resignation from Ancra, Abato also was meeting and discussing with customers that he and Wolford and Arnold were planning on leaving Ancra for Kinedyne in an attempt to solicit said customers' business for Kinedyne.

62.    On March 8, 2012, Ancra wrote to James Klausmann, II, Executive Vice President of Kinedyne, and Amy Bellerive, Human Resources Manager for Kinedyne, and reminded Kinedyne of Abato's, Wolford's, and Arnold's contractual obligations with Ancra.  A copy of the March 8 correspondence is attached as Exhibit J to this Complaint and incorporated herein by reference.

63.    On March 14, 2012, James Klausmann II responded to Ancra's March 8 correspondence, stating:

> In response to your request to our legal counsel, Kinedyne takes very seriously the protection of its own confidential information and that of others.  Upon the hiring of Messrs. Abato, Wolford, and Arnold each were told verbally that we expected that they were to honor any existing confidentiality provisions covering information that is not otherwise publicly available.  Further, we had them confirm this responsibility to us in writing as a condition of their employment with us.  Lastly, we communicated to our relevant employees the fact that these three employees had certain responsibilities to protect confidential information of their previous employer.

> We hope that Ancra takes the same sound business measures to protect the information of prior employers of its employees including, but not limited to, former Kinedyne employees with whom Kinedyne has signed confidentiality agreements such as Jim Calico.

A copy of the March 14 correspondence is attached as Exhibit K to this Complaint and incorporated herein by reference.

64.     Despite Defendants' assurances to the contrary, Defendants have engaged and will continue to engage in misappropriation of Ancra's trade secrets and proprietary information and unfair competition with Ancra.  Ancra continues to investigate the extent of Defendants' anticompetitive and unlawful activities.

65.     As a direct and proximate result of Defendants' actions including, but not limited to, Abato's violation of his contractual, statutory, and common law obligations, and Defendants' unfair competition with Ancra, Ancra has been, and continues to be, damaged in an amount that is impossible to ascertain unless Defendants are enjoined from misappropriating Ancra's proprietary and confidential information and trade secrets and unfairly competing with Ancra. Moreover, if Defendants are not so enjoined, Ancra will continue to be irreparably harmed by, among other things, loss of goodwill, loss of customer and business information, loss of corporate opportunity, and will continue to suffer present and future economic loss.

66.     Ancra has already suffered and will continue to suffer irreparable injury and harm to its business, and monetary damages alone are an inadequate redress for such continuing injury.

**Count One: Violation of Computer Fraud and Abuse Act as to Defendants**

67.     Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

68.     The Ancra computer(s) accessed by Defendants are "protected computers" for purposes of 18 U.S.C. § 1030 because they were used in interstate commerce or

19.

communications.

69.     By their wrongful actions, Defendants – and others working under their direction and express instruction – intentionally accessed and downloaded files on Ancra's protected computers without any authorization and/or in excess of any authorized access, and thereby obtaining information from Ancra's protected computers.

70.     By their wrongful actions, Defendants knowingly and with intent to defraud accessed and downloaded Ancra's confidential computer files without authorization and/or in excess of any authorized access.  As a result, Defendants obtained things of value, including Ancra's Proprietary Information and trade secrets.

71.     By his wrongful actions, Abato acted knowingly and intentionally when he without authorization and/or in excess of any authorized access, destroyed data from his work computer, including emails, in an effort to hide his wrongdoing.

72.     By their wrongful actions, Defendants intentionally accessed Ancra's protected computer system without authorization, and as a result of such conduct, caused Ancra damage and/or loss.

73.     The wrongful conduct of Abato was done with inducement from and with the knowledge and participation of Kinedyne and its executives, or for the benefit of Kinedyne, such that Kinedyne is equally responsible for the wrongful conduct of Abato.

74.     Abato's downloading, copying and/or electronic transfer of Ancra's confidential computer files, including Proprietary Information and trade secrets, for Defendants' anticompetitive actions threatens to damage Ancra's relationships with current and prospective customers, thereby inflicting irreparable harm.

75.     Defendants' actions constitute a violation of the Computer Fraud and Abuse Act,

18 U.S.C. §§ 1030(a)(2)(c), (a)(4), and (a)(5).

76.     Defendants' wrongful and unlawful actions with respect to Ancra's protected computers have caused Ancra more than $5,000 in damages and/or loss.  Indeed, the retention of forensic technicians (who recovered some of the data Abato intended to destroy) alone cost more than $5,000.

**Count Two: Breach of Contract – Breach of Employment Agreement as to Abato**

77.     Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

78.     As a condition of his affiliation and continued employment with Ancra, Abato entered into the Employment Agreement that: prevented him from competing directly or indirectly with Ancra during his employment; required the protection and non-disclosure of Proprietary Information and inventions both during and subsequent to his employment with Ancra; assigned to Ancra all inventions and other intellectual property developed or conceived during the course of Abato's employment; mandated that in the event of his cessation of employment, Abato deliver to Ancra all materials or property of any nature belonging to Ancra or pertaining to his work with Ancra; and prohibited Abato from taking with him, or allowing a third party to take, any of Ancra's materials or property of any nature belonging to Ancra or pertaining to Abato's work with Ancra.

79.     By and through his actions, Abato has breached his contractual obligations as set forth in the Employment Agreement.

**Count Three: Breach of Contract – Breach of Employee Proprietary Information and Inventions Agreement as to Abato**

80.     Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

81.    As a condition of his affiliation and continued employment with Ancra, Abato entered into the Employee Proprietary Information and Inventions Agreement that: prevented him from competing directly or indirectly with Ancra during his employment; required the protection and non-disclosure of Proprietary Information and inventions both during and subsequent to his employment with Ancra; assigned to Ancra all inventions and other intellectual property developed or conceived during the course of Abato's employment; mandated that in the event of his cessation of employment, Abato deliver to Ancra all materials or property of any nature belonging to Ancra or pertaining to his work with Ancra; prohibited Abato from taking with him, or allowing a third party to take, any of Ancra's materials or property of any nature belonging to Ancra or pertaining to Abato's work with Ancra; prohibited Abato from soliciting any Ancra employees to leave Ancra or to work for anyone in competition with Ancra, or from soliciting, enticing or in any way diverting any Ancra customer or supplier to do business with any business entity in competition with Ancra during his employment and for a period of two (2) years following cessation of employment with Ancra; and, during his employment with Ancra prohibited Abato from planning or otherwise taking any preliminary steps, either alone or in concert with others, to set up or engage in any business enterprise that would be in competition with Ancra.

82.    By and through his actions, Abato has breached his contractual obligations as set forth in the Employee Proprietary Information and Inventions Agreement.

**Count Four: Misappropriation of Trade Secrets by Defendants**

83.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

84.    Ancra has maintained and developed highly valuable trade secrets as defined in

the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-51 et seq. ("CUTSA"), and other proprietary information which is safeguarded as confidential and secret and protected from direct or indirect disclosure.

85. Ancra's trade secrets and other proprietary information are extremely valuable and critical to the operation of Ancra's business.

86. Under CUTSA, actual or threatened misappropriation of trade secrets may be enjoined and damages and attorney fees may be awarded.

87. The conduct of Defendants constitutes the actual or threatened misappropriation, misuse, and/or inevitable disclosure or reliance upon Ancra's trade secrets and other confidential and proprietary information.

88. Abato had access to Ancra's trade secrets and other confidential and proprietary information during his affiliation with Ancra.

89. Abato's actions expose Ancra to the disclosure, threatened disclosure, and/or inevitable disclosure of Ancra's valuable trade secrets and other confidential and proprietary information.

90. Abato has failed to protect or otherwise not use or disclose Ancra's trade secrets and other confidential and proprietary information.

91. Defendants' actions as herein described constitute unlawful misappropriation by improper means of Ancra's trade secrets in violation of CUTSA.

92. Unless Defendants are enjoined from disclosing and utilizing Ancra's trade secrets and other confidential and proprietary information, Ancra will continue to be immediately and irreparably harmed since its competitors have received, will continue to receive, and have the use of trade secrets and other confidential information developed and maintained by

23.

Ancra that is not generally known to the public; and Defendants can use such trade secrets and confidential information to their economic advantage and to Ancra's detriment in competing unfairly with Ancra.

93.     Ancra has taken reasonable precautions to preserve the secrecy of the trade secrets known to Abato.

94.     Defendants' threatened misappropriation and/or misappropriation of Ancra's trade secrets is willful and malicious.

95.     As a result of the threatened misappropriation and/or misappropriation of Ancra's trade secrets by Defendants, Ancra has suffered and will continue to suffer damages, as well as immediate and irreparable harm. Ancra has no adequate remedy at law.

96.     Abato is now an employee of, and/or in association with, Kinedyne, a direct competitor of Ancra, and the trade secrets and confidential information belonging to Ancra are valuable to Abato and Kinedyne.

97.     Defendants have relied, have threatened to rely upon, and/or will inevitably rely upon and/or use to their advantage, the trade secrets and confidential information of Ancra set forth above. Unless Defendants are enjoined from disclosing and/or utilizing these trade secrets and confidential information and Proprietary Information, Ancra will continue to be immediately and irreparably harmed since its competitor Kinedyne will receive and have the use of confidential information developed solely through the resources of Ancra and not generally known to the public, information which Defendants can use to their economic advantage and to Ancra's detriment in competing with Ancra.

98.     As a result of Defendants' misappropriation and/or threatened misappropriation of Ancra's trade secrets, Ancra has suffered damages, as well as immediate and irreparable harm.

**Count Five: Unfair Competition by Defendants**

99.     Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

100.    Defendants have engaged in conduct that is contrary to the honest practice in industrial or commercial matters.  Defendants' conduct was intentionally designed to gain unfair competitive advantage by causing harm to the ability of Ancra to compete in an open and fair marketplace.  The conduct engaged in by Defendants' was known, or should reasonably have been known, to cause harm to the legitimate business interests of Ancra.

101.    Defendants' conduct is unethical, unscrupulous, unfair and deceptive, and constitutes an unfair method of competition or trade practice in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110 et seq. ("CUTPA").

102.    Defendants' conduct is intentional and willful.

103.    Defendants' violation of CUTPA was carried out for the purpose of competing unfairly with Ancra.

104.    This Complaint was served upon the Attorney General for the State of Connecticut.

105.    As a result of Defendants' violation of CUTPA, Ancra has been and will continue to be severely and irreparably damaged.

**Count Six: Breach of Duty of Loyalty as to Abato**

106.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

107.    As a result of his employment at Ancra, Abato owed a duty of loyalty to Ancra.

108.    As such, he owed Ancra a duty to act in their best interests.

25.

109.    Abato's radically unfaithful conduct, as aforesaid, constitutes a willful breach of his duty of loyalty to Ancra.

110.    Consequently, Abato has forfeited compensation he received during his period of disloyalty.

111.    As a result, Ancra has been and will continue to be severely and irreparably damaged.

**Count Seven: Breach of Fiduciary Duty as to Abato**

112.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

113.    As a result of his employment with Ancra, his high level position at Ancra, and his duty to represent the interests of Ancra, Abato owed a fiduciary duty to Ancra.

114.    As such, he owed Ancra a fiduciary duty to act in their best interests.

115.    Abato's radically unfaithful conduct, as aforesaid, constitutes a willful breach of his fiduciary duty to Ancra.

116.    Consequently, Abato has forfeited compensation he received during his period of disloyalty.

117.    As a result, Ancra has been and will continue to be severely and irreparably damaged.

**Count Eight: Breach of Implied Duty of Good Faith and Fair Dealing as to Abato**

118.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

119.    Abato, while employed at Ancra, had a duty of good faith and fair dealing toward Ancra which was implied in his Employment Agreement and/or Proprietary Information

Agreement with Ancra.

120.    Abato acted in bad faith when he intentionally and/or willfully breached his contractual duty of good faith and fair dealing by: failing to return Ancra's Proprietary Information and/or wrongfully and secretly destroying Ancra's Proprietary Information; failing to keep confidential Ancra's Proprietary Information during and subsequent to his employment with Ancra; soliciting Ancra employees to work for Kinedyne; and, during his employment with Ancra, directly competing with Ancra and/or planning or otherwise taking preliminary steps, either alone or in concert with others, to set up or engage in a business enterprise that would be in competition with Ancra.

121.    As a consequence of Abato's breach, Ancra has been and will continue to suffer irreparable harm.

122.    Ancra has been and will continue to be severely and irreparably damaged by Abato's wrongful conduct.

**Count Nine: Misuse of Computer Information as to Defendants (Conn. Gen. Stat. §§ 53a-251 and 52-570b)**

123.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

124.    Abato accessed or caused to be accessed Ancra's computer, and intentionally made or caused to be made an unauthorized display, use, disclosure or copy of the data residing in the computer.

125.    The information Abato misused includes Ancra's Proprietary Information and trade secrets.

126.    Ancra is the owner of the computer which it provided to Abato for his use during his employment.

127.    Abato intentionally or recklessly and without authorization from Ancra, altered, deleted, tampered with, damaged, destroyed and/or took data intended for use by Ancra's computer system from the computer in his possession.

128.    The wrongful conduct of Abato was done with inducement from and with the knowledge and participation of Kinedyne and its executives, or for the benefit of Kinedyne, such that Kinedyne is equally responsible for the wrongful conduct of Abato.

129.    Defendants' conduct constitutes the misuse of computer information in violation of Connecticut General Statutes § 53a-251, as a result of which Ancra has been and will continued to suffer irreparable harm.

130.    As a result of Defendants' conduct, Ancra has been and will continue to be severely and irreparably damaged.

## Count Ten: Unauthorized Use of Computer as to Defendants (Conn. Gen. Stat. §§ 53-451 and 53-452)

131.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

132.    Abato intentionally and without authority from Ancra made or caused to be made an unauthorized copy of Ancra's computer data.

133.    The information Abato wrongfully copied includes Ancra's Proprietary Information and trade secrets.

134.    The wrongful conduct of Abato was done with inducement from and with the knowledge and participation of Kinedyne and its executives, or for the benefit of Kinedyne, such that Kinedyne is equally responsible for the wrongful conduct of Abato.

135.    Defendants' conduct constitutes the unauthorized use of a computer in violation of Connecticut General Statutes § 53-451, as a result of which Ancra has been and will continued

28.

to suffer irreparable harm.

136.    As a result of Defendants' conduct, Ancra has been and will continue to be severely and irreparably damaged.

## Count Eleven: Tortious Interference with Contract as to Kinedyne

137.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

138.    Defendant Kinedyne has encouraged, induced or attempted to induce, and/or assisted or attempted to assist Abato to violate the terms of the Employment Agreement and/or Proprietary Information Agreement in order to enable it and him to unfairly compete against Ancra.

139.    Kinedyne intentionally, improperly and without privilege interfered with the Employment Agreement and/or Proprietary Information Agreement between Ancra and Abato.

140.    Kinedyne had knowledge of the existence of the Employment Agreement and/or Proprietary Information Agreement and had no privilege to interfere with the Employment Agreement and/or Proprietary Information Agreement.

141.    As a result of Kinedyne's tortious and wrongful actions, Ancra has suffered damages, as well as immediate and irreparable harm to its business and its business relationships with customers.

## Count Twelve: Tortious Interference with Business Relations as to Defendants

142.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

143.    Over the years, Ancra has developed advantageous economic relationships with its customers and potential customers that contain the probability of future economic benefit to

Ancra.

144.    Upon information and belief, Abato, with knowledge and authorization of Kinedyne, has encouraged, induced or attempted to induce, and/or assisted or attempted to assist third parties, including customers, to terminate their business relationships and/or agreements with Ancra in order to enable Defendants to unfairly compete against Ancra.

145.    Defendants intentionally, improperly and without privilege interfered with the business relationships between Ancra and its customers.

146.    Defendants had knowledge of the existence of the business relationships and/or agreements between Ancra and its customers, and Defendants had no privilege to interfere with those business relationships and/or agreements.

147.    As a result of Defendants' tortious and wrongful actions, Ancra has suffered damages, as well as immediate and irreparable harm to its business and its business relationships with customers.

**Count Thirteen: Conversion as to Defendants**

148.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

149.    The proprietary information and trade secrets Defendants have retained are the property of Ancra.

150.    Defendants have wrongfully exercised dominion and control and retained, withheld and converted Ancra's property, including without limitation, Ancra's proprietary information and trade secrets.

151.    Defendants' retention, withholding and conversion of Ancra's property prevents and otherwise seriously interferes with Ancra's rights to and use of such property.

152.    As a consequence of Defendants' wrongful actions, Ancra has been and will continue to suffer irreparable harm.

153.    As a result of Defendants' wrongful conversion, Ancra has been and will continue to be severely and irreparably damaged.

**Count Fourteen: Statutory Theft as to Defendants (Conn. Gen. Stat. § 52-564)**

154.    Ancra incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

155.    Defendants knowingly received, took, or obtained and/or concealed Ancra's stolen property.

156.    Defendants' conduct was done with the intent to deprive Ancra of its property, including Ancra's proprietary and confidential information and trade secrets, and/or to appropriate Ancra's property to Defendants.

157.    Defendants' wrongful retention and concealment of Ancra's proprietary and confidential information and trade secrets violates Connecticut General Statutes § 52-564.

158.    As a result of Defendants' conduct, Ancra has been injured.

159.    Defendants are liable to Ancra for treble damages for civil theft pursuant to Connecticut General Statutes § 52-564.

31.

## PRAYER FOR RELIEF

WHEREFORE, Ancra prays for its order and judgment as follows:

A.     Preliminary and permanent injunctive relief enjoining Abato from becoming engaged as an employee or otherwise providing services to Kinedyne or any of their subsidiaries for a period of two (2) years from the date of his cessation of employment with Ancra;

B.     Preliminary and permanent injunctive relief enjoining Kinedyne from employing Abato, Wolford or Arnold for a period of two (2) years from the date of their cessation of employment with Ancra;

C.     Preliminary and permanent injunctive relief enjoining Kinedyne, Abato, Wolford, and Arnold from using or disclosing any of Ancra's proprietary or confidential information or trade secrets;

D.     Preliminary and permanent injunctive relief enjoining Abato, Wolford, and Arnold from providing services to Kinedyne such as would result in the probable disclosure of Ancra's trade secrets and other confidential and proprietary information;

E.     Preliminary and permanent relief enjoining Abato and Kinedyne from the solicitation of employees of Ancra for the purpose of providing services to Kinedyne or to encourage them to terminate their relationship with Ancra;

F.     Preliminary and permanent injunctive relief enjoining Defendants from soliciting, enticing or in any way diverting any of Ancra's customers or suppliers to do business with Kinedyne for a period of two (2) years from the date of Abato's cessation of employment with Ancra;

G.     Preliminary and permanent injunctive relief enjoining Defendants from working on, pursuing, or in any way using the proprietary product design concept being developed with

Ancra Systems B.V., whether under the "Loadrunner" or "LoadmatiK" or any other trade name, and assigning all rights therein to Ancra;

H.     Preliminary and permanent injunctive relief enjoining Defendants from developing a product the same as, similar to or competitive with the proprietary product design concept being developed with Ancra Systems B.V., whether under the "Loadrunner" or "LoadmatiK" or any other trade name;

I.     An accounting of the information and materials, electronic and/or in hard copy, taken, copied, downloaded or misappropriated by Abato, Wolford, Arnold and/or Kinedyne from Ancra;

J.     Forfeiture of Abato's salary, compensation and bonuses during the period of disloyalty;

K.     Compensatory damages for breach of contract;

L.     Punitive damages pursuant to Connecticut General Statutes § 35-53;

M.     Treble damages pursuant to Connecticut General Statutes §§ 52-570b and 52-564;

N.     Attorneys' fees;

O.     Costs;

P.     A jury trial on all claims so triable; and

Q.     Such other and further relief, legal and equitable, that this Court deems just and proper.

Respectfully Submitted,

/s/ Patricia Reilly
Patricia Reilly CT08352
preilly@littler.com
Matthew K. Curtin CT27765
mcurtin@littler.com
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street
Suite 300
New Haven, CT 06510
Telephone:     203.974.8700
Facsimile:     203.974.8799

Attorneys for Plaintiff
Ancra International LLC

# EXHIBIT A

io to Previous message | Go to Next message | Back to Messages

Mark as Unread | Printable View



Move...

Flag this message

# RE: RE: Confidential Ancra Greetings

Tuesday, December 13, 2011 3:22 PM
From:
'Senderling, Lisa" <LSenderling@KINEDYNE.COM>
Add sender to Contacts
To:
'RALPH ABATO JR" <ralphl@snet.net>
Message contains attachments
1 File (203KB)

 • ◦ 12-20-2011 directions via 287.pdf

Ralph,

Although Google Maps indicated there were three different routes you could take, I am providing you with the one we felt would be the most efficient and direct route (attached).

Please let me know if I can be of further assistance.

Thank you.

Lisa

From: RALPH ABATO JR [mailto:ralphl@snet.net]
Sent: Friday, December 09, 2011 5:01 PM
To: Senderling, Lisa
Subject: Re: RE: Confidential Ancra Greetings

9 Ten Acre Rd. New Britain, CT 06052

Sent from Yahoo! Mail on Android

---

From: Senderling, Lisa <LSenderling@KINEDYNE.COM>;
To: Ralph Abato <ralphl@snet.net>;
Subject: RE: Confidential Ancra Greetings
Sent: Fri, Dec 9, 2011 9:20:33 PM

Hello Ralph,

So that I can provide you with the most accurate/efficient route, please advise as to where you will be travelling from.

Thank you.

Kind regards,

Lisa Senderling

**Kinedyne Corporation**

(908) 231-1800 ext. 139

---

**From:** Klausmann, Jamie
**Sent:** Friday, December 09, 2011 9:36 AM
**To:** Ralph Abato
**Cc:** Senderling, Lisa; Klausmann, Jim
**Subject:** RE: Confidential Ancra Greetings

Good morning Ralph,

We are still on for our meeting on the 20th. If she has not already done so I will have Lisa send you directions. We will plan on a 10am start. If you are delayed or run into a conflict you can reach me on my cell phone at 908-581-9854.

afe travels and we look forward seeing you.


amie

---

rom: Ralph Abato [mailto:ralphl@snet.net]
ent: Friday, December 09, 2011 9:28 AM
o: Klausmann, Jim
e: Klausmann, Jamie; Senderling, Lisa
ubject: Re: Confidential Ancra Greetings


leading to Australia Sunday afternoon. Arrive back midnight on the 18th...Hope we are still on for Tuesday the 20th. I can probably get to the
lub by 10AM. Let me know if anything changes.


alph

----- Original Message -----

From: Klausmann, Jim

To: Ralph Abato

Cc: Klausmann, Jamie ; Senderling, Lisa

Sent: Friday, November 04, 2011 1:47 PM

Subject: RE: Confidential Ancra Greetings


Ralph


We could meet at Fiddlers Elbow Country Club which is about 3-4 miles from our North Branch, NJ office. It's right off an
exit on Rte 78. I'll have Jamie's assistant Lisa send you directions when we get a little closer to the date.


Safe travels on all your trips


Jim

---

From: Ralph Abato [mailto:ralphl@snet.net]
Sent: Friday, November 04, 2011 2:07 PM
To: Klausmann, Jim

Cc: Klausmann, Jamie
Subject: Re: Confidential Ancra Greetings

I'll plan on coming down. Which location will you be at?

Ralph

----- Original Message -----

From: Klausmann, Jim

To: Ralph Abato

Cc: Klausmann, Jamie

Sent: Friday, November 04, 2011 10:12 AM

Subject: RE: Confidential Ancra Greetings

Ralph

We can make that day work for both of us. Can you drive down to NJ to meet?

Jim

---

From: Ralph Abato [mailto:ralphl@snet.net]
Sent: Thursday, November 03, 2011 1:26 PM
To: Klausmann, Jim
Subject: Re: Confidential Ancra Greetings

It will have to be a day right before Christmas at this point. We can meet Tuesday the 20th, I should be mentally back in this time zone...Let me know if this will work?

Ralph

----- Original Message -----

From: Klausmann, Jim

To: RALPH ABATO JR

Sent: Thursday, November 03, 2011 12:06 PM

Subject: RE: Confidential Ancra Greetings

Ralph

I will be in China Nov 28 - Dec 12 so that week won't work. Jamie will be in China Nov 12-19. We are both tied up in meetings Nov 21-23 and then we have Thanksgiving. Do you have a day next week? If not, when do you get back from Australia? Maybe we can squeeze in a day before Christmas?

Let me know.

Jim

From: RALPH ABATO JR [mailto:ralphl@snet.net]
Sent: Tuesday, November 01, 2011 2:58 PM
To: Klausmann, Jim
Subject: RE: Confidential Ancra Greetings

I have a couple trips planned this month and a last one for December 11 to Australia. Maybe we can meet in CT or NJ mid week of December 5th?

Ralph

--- On Tue, 11/1/11, Klausmann, Jim <*jklausmann@kinedyne.com*> wrote:

> From: Klausmann, Jim <jklausmann@kinedyne.com>
> Subject: RE: Confidential Ancra Greetings
> To: "RALPH ABATO JR" <ralphl@snet.net>
> Date: Tuesday, November 1, 2011, 11:38 AM
>
> Hi Ralph
>
> Sorry for the late reply. I just got back from China last Wednesday and now I'm visiting my son and his family in Idaho for a couple of days.

I would like to meet with you and include Jamie sometime before the end of the year. I know we all have very busy schedules so why don't you propose some potential dates and we'll see what we can work out. Where we meet is not critical - we can work that out also.

I totally understand the need to keep this very confidential.

I look forward to hearing from you.

Best Regards

Jim

**From:** RALPH ABATO JR [mailto:ralphl@snet.net]
**Sent:** Wednesday, October 26, 2011 8:42 PM
**To:** Klausmann, Jim
**Subject:** Confidential Ancra Greetings

Jim, you and I don't know eachother very well after all these years. Perhaps it is time we talked. As you may know there have been changes within our organization, most feel not for the best. Management made some desisions a little over a year and a half ago, and now we have an extremely divided team and I am exploring opportunities to rectify this. I am not looking for a job, but looking at Global Industry wide opportunities that may benefit us both. If you have interest, let me know via this e-mail address. I am in Brazil right now and have several International trips planned over the next 7 weeks. If you are in the US, I am sure we can find a mutual meeting place, if not soon, than right after the first.

I am contacting you and not Jamie at this point, not to exclude him, but I feel he is very close to the day to day business, and I want to discuss the broader picture with you initially. You can then decide if it makes sense to go further. Of course at this point, this is strictly confidential.

Ralph Abato

VP International Sales

Ancra International

860-729-6895 Cell





# EXHIBIT B

Cargo Systems Division, Erlanger KY
1-800-233-8138 / Fax 1-800-347-2627

Ralph Abato
Director of International Sales
860-225-4521
Rabato@ancra.com

# *Ancra International LLC*
## *Cargo Systems Division*

**REDACTED**

*Visit our website at: www.ancra-llc.com*

**REDACTED**

Visit with Jasper and Willem of Ancra NL.  Recent sales figures put their sales at $.  REDACTED
Euros (about $ REDACTED USD. Willem is REDACTED shareholder and Jasper and Management team have
the balance.
Agenda planned for Thursday December 1:

| | |
|---|---|
| Tour facility and meet team | 9:30 - 10:30 |
| REDACTED  demo (with REDACTED ) | 10:30 – 12:00 |
| Lunch (with REDACTED ) | 12:00 – 12:30 |
| Site visit REDACTED  (with REDACTED ) | 12:30 – 13:30 |
| Site visit REDACTED | 14:00 – 14:30 |
| Back to REDACTED | 14:30 – 15:00 |
| Discuss REDACTED | 15:00 - 17:30 |
| Dinner  (Willem will join us) | 18:00 – 20:00 |

Great meeting with    REDACTED.  Met with Head of their Expediting Department, Willem
Zandvliet. They had heard about system from .       REDACTED        .  REDACTEDhave been a bit
unresponsive since committing verbally to this program 8 weeks ago. The suspicion is that
their financial results have not met expectations and spending cuts have been forced upon
them. Ultimately, Jasper is looking to understand if Ancra wants to pursue a JV and invest in
a prototype system to market to the US (approx. $REDACTED). We need to have this system in
place so we can present at ProMat show in early 2013. Potential customers would be fast
moving Consumer Goods companies (FMCG) such as           REDACTED
    REDACTED              .                    , etc. We could invite    REDACTED        ·to Modex
2012 in Atlanta to see interest in the Loadrunner system and see if she believes in investing
in this product for US market. We can invite several key target accounts to our booth to see
the video and learn about the product including        REDACTED              and
other high profile accounts. Their enthusiasm will dictate which direction we head here. Paul,
Jasper and I can get on a call in next week or so to discuss how to approach key accounts to
invite them for the February show.

Cargo securement standards are tightening in Europe. Even still, there are no European trailer
standards, just each country with their own. Willem feels that Load Lok would be a god
acquisition for this market.




**REDACTED**

**REDACTED**

**Ralph Abato**

# EXHIBIT C

**REDACTED**

---

**From:** Abato, Ralph
**Sent:** Friday, December 09, 2011 5:08 AM
**To:** Jon Hicks; Frediani, Steve; Fong, Nelson; Leone, Tom
**Cc:** Eric Gunia
**Subject:** RE: Project Japan

The comment was made that we (Ancra) are apparently in the driver's seat on the bid. This came from an inside source confidentially to Jasper. I do not think REDACTED was involved in this breach.

Jasper is naturally concerned that as we are deep in discussion on a partnership or JV on the new Loadrunner product, we are talking to his competitor and may purchase the company. He feels that if we were to buy them, it would be a good opportunity. He just wants to know where we stand.

I am traveling to our Australia facility Sunday afternoon and would not be available till Tuesday afternoon (their time) for any call. Let me know.

Ralph Abato
Vice President of International Sales
Ancra International
2685 Circleport Drive
Erlanger, KY 41018
860-225-4521
Cell 860-729-6895
rabato@ancra.com

---

**From:** Jon Hicks [mailto:jhicks@heico-acq.com]
**Sent:** Thursday, December 08, 2011 10:11 PM
**To:** Abato, Ralph; Frediani, Steve; Fong, Nelson; Leone, Tom
**Cc:** Eric Gunia
**Subject:** Re: Project Japan

All - I'm not available until monday. I submitted a bid on REDACTED to keep our options open, understanding that steve has a full plate at the moment. Obviously not great respect for confidentiality on their side. We can do what makes sense for you, including sending any message back to REDACTED, or withdrawing

our bid if it jeopardizes a significant ancra project. Let me know by email, or we can discuss on
monday. Thank you. Jon

---

**From:** Abato, Ralph
**To:** Jon Hicks; Frediani, Steve ; Fong, Nelson ; Leone, Tom
**Cc:** Eric Gunia
**Sent:** Thu Dec 08 16:56:18 2011
**Subject:** RE: Project Japan

Received a confidential call from Jasper at Ancra NL regarding this today. Can
we discuss tomorrow? He heard we were a bidder here and wants to
understand how this will affect our potential partnership on the new
Loadrunner system he has been promoting to ᵣₑₐcₜₑₐand   REDACTED  . I told him I
was bound by confidentiality as well and that is why we did not discuss while I
was in NL last week.

Ralph Abato
Vice President of International Sales
Ancra International
2685 Circleport Drive
Erlanger, KY 41018
860-225-4521
Cell 860-729-6895
rabato@ancra.com

**REDACTED**

# EXHIBIT D

ID: >1_22675_AE7SimIAAV2eTx1b+Qtj5hS++rY
ags: isReplied="0" isFlagged="0" isRead="1" isDraft="0" isForwarded="0" isHam="0" isSpam="0"
asAttachment="0" inAddressBook="0" isRecent="1"
mail received timestamp (receivedDate): **Jan 23, 2012 - 13:09:08 (UTC)**
mail sent timestamp (sentDate): **Jan 23, 2012 - 13:09:08 (UTC)**
ubject: **FW: Sat Meeting**
rom Name: **Klausmann, Jamie**
rom Email: **jklausmann2@kinedyne.com**
o Name: **Ralph Abato (ralphl@snet.net)**
o Email: **ralphl@snet.net**


alph,

:nbsp;

orgot to mention I like your thought regarding LoadmatiK.

:nbsp;

amie

:nbsp;

rom: Klausmann, Jamie
ent: Monday, January 23, 2012 8:07 AM
o: &#39;Ralph &#39;
:c: Klausmann, Jim
ubject: RE: Sat Meeting

:nbsp;

talph,

:nbsp;

/ly father and I were equally impressed with Jasper and the opportunity.  We will continue to discuss and
valuate location options for the prototype and be prepared to speak to our recommendations during our next
neeting.  In the mean time we will await Jaspers review with his team and hopefully a letter of intent.

:nbsp;

was out of the office Friday afternoon and did not receive your voicemail until this morning.  I assume that we
:overed the open issues you wanted to discuss during our meeting.  If not, feel free to give me a call when
:onvenient.

:nbsp;

tegards,

:nbsp;

amie

nbsp;

.nbsp;

.nbsp;

rom: Ralph [mailto:ralphl@snet.net]
ent: Sunday, January 22, 2012 5:56 PM
o: Klausmann, Jamie; Klausmann, Jim
ubject: Re: Sat Meeting

:nbsp;

hanks for taking the time to meet today. I know Jasper came away very impressed by you both, and your obvious
rasp of the opportunity. I hope you also see the tremendous upside here. This can be an important part of the
ompanyâ¬ "!s future and a strategic revenue producer.

:nbsp;

im, have a great week in PR. Jamie, Iâ¬ "!m sure we talk some during the week (send e-mails as I will be with
thers).

:nbsp;

inal thought â¬ Joint venture name â¬ LOADMATIK with the Kinedyne K at the end... to tie in with the brand.

:nbsp;

:alph

:nbsp;

'rom: Klausmann, Jamie
ient: Thursday, January 19, 2012 4:24 PM
'o: Ralph
iubject: RE: Sat Meeting

:nbsp;

'erfect.  I have Lisa working on reserving us a room.  See you then.

:nbsp;

amie

:nbsp;

'rom: Ralph [mailto:ralphl@snet.net]
ient: Thursday, January 19, 2012 4:06 PM
'o: Klausmann, Jamie
iubject: Re: Sat Meeting

:nbsp;

ood for Sunday AM meeting. Iâ¬ "!ll plan to have dinner with Jasper Saturday night.

.nbsp;

alph

.nbsp;

rom: Klausmann, Jamie

ent: Thursday, January 19, 2012 2:30 PM

o: RALPH ABATO JR

ubject: RE: Sat Meeting

:nbsp;

.alph,

:nbsp;

recently caught up with my father on our meeting with Jasper.  He very much wants to participate but can
:ally only commit to a Sunday morning meeting.  If that works for you and Jasper I propose we meet with the
wo of you Sunday morning at 8:30 am at the hotel.

'.nbsp;

.et me know if that works and what you think.  If Sunday is problematic then we will stick with the original
·lan and I will see you on Sat night.

'.nbsp;

'inally, I am going to have my assistant look into a meeting room for us but will wait to hear from you first regarding
he time.

'.nbsp;

'hanks

'.nbsp;

amie

'.nbsp;

?rom: RALPH ABATO JR [mailto:ralphl@snet.net]
;ent: Wednesday, January 18, 2012 7:31 PM
['o: Klausmann, Jamie
;ubject: Re: Sat Meeting

'.nbsp;

[&#39;ll call you tomorrow.

Ralph

ent from Yahoo! Mail on Android

nbsp;

---

rom: Klausmann, Jamie &lt;jklausmann2@kinedyne.com&gt;;
o: Ralph Abato (ralphl@snet.net) &lt;ralphl@snet.net&gt;;
ubject: Sat Meeting
ent: Wed, Jan 18, 2012 9:33:06 PM

Iello Ralph,

nbsp;

Vanted to drop you a line to let you know I did not forget about you.  After reviewing all of the information I ad available to me, principally from the Ancra Netherlands website, I was able to answer many of my general uestions.  What remains to be discussed is:

\·        detailed review of the new proprietary auto loading system

\·        an understanding of the basic framework for the icensing/sales/mfg agreement Jasper is proposing

\·        an understanding from Jasper as to his expectations of us as a icensee

\·        a rough time line from your/Jaspers perspective of the nilestones and action items required to make a successful launch of the system in NA

Â·        a rough sales/go to market strategy and time line to include list of principal challenges/hurdles in our market

 

. have yet to email Jasper directly as it seems a bit awkward.  If you have a few minutes tomorrow maybe we ould find time to discuss.

 

Regarding a meet and greet discussion with Mark and Paul will you find out if they can be available at 6:00 EST either Wed or Thur of next week?

 

Thanks and I look forward to hearing from you.

 

Regards,

 

Jamie

 

# EXHIBIT E

## EMPLOYMENT AGREEMENT

Ancra International LLC (hereinafter "Ancra"), and Ralph Abato (hereinafter "Employee") enter into this Employment Agreement ("Agreement") on the 7th day of June, 2000.

WHEREAS, Ancra is engaged in a continuous program of research, development, design and production respecting its business, present and future;

WHEREAS, Ancra desires to employ Employee and Employee desires to accept employment with Ancra on the terms and conditions stated in this Agreement;

WHEREAS, as part of Employee's employment by Ancra ("Employment"), Employee may be expected to make new contributions and inventions of value to the Company;

WHEREAS, Employee understands that his Employment by Ancra creates in him a duty of trust and confidentiality to Ancra with respect to any information (1) related, applicable or useful to the business of Ancra, including Ancra's anticipated research and development; or (2) resulting from tasks assigned to Employee by Ancra; or (3) resulting from the use of equipment, supplies or facilities of Ancra; or (4) related, applicable or useful to the business of any client or customer of Ancra, which may be made known to Employee by Ancra or by any client or customer of Ancra, or learned by Employee during the period of his Employment; and

WHEREAS, Ancra is willing to employ Employee based on the representations and warranties made by Employee in Paragraph 4 below, which Employee is willing to make and upon which Employee acknowledges Ancra will reasonably rely without additional or independent investigation.

NOW, THEREFORE, Ancra and Employee agree as follows:

1.   EMPLOYMENT:

Ancra hereby employs Employee and Employee accepts such employment by Ancra on the terms and conditions hereinafter set forth.

2.   BASE COMPENSATION:

For all services rendered by Employee under this Agreement, Ancra shall pay Employee a base salary (the "Base Compensation") of One Hundred Thousand Dollars ($100,0000.00) per year, during the term hereof, payable, net of withholdings and taxes, in equal semi-monthly installments. In accordance with Ancra's policy, Employee's performance shall be reviewed annually. Ancra may consider the appropriateness of an adjustment in Employee's Base Compensation from time to time in accordance with Ancra's policy, which shall be at the sole discretion of Ancra.

3.   **ADDITIONAL COMPENSATION:**

In addition to the Base Compensation, Employee shall be eligible for an annual bonus. This bonus will be paid in accordance with Ancra's existing bonus policy. Upon execution of this Agreement, Employee will receive an $8,000 lump sum payment, net of withholdings and taxes.

4.   **REPRESENTATIONS AS TO PRIOR EMPLOYMENT:**

As a material inducement to Ancra to enter into this Agreement and employing Employee, Employee hereby represents and warrants to Ancra as follows:

(a)   Employee is not, and has never been, a party to any employment agreement, express or implied, with any employer which requires Employee to continue any employment beyond the effective date of Employment pursuant to this Agreement, and the undertaking of this Employment by Employee with Ancra and compliance with the terms of this Agreement will not constitute a breach of any agreement to which Employee is a party or any obligation by which Employee is bound.

(b)   Employee has not and will not use or divulge to anyone any proprietary materials or information provided to him in confidence by any previous employer.

(c)   Employee has no obligation to others that is inconsistent with the terms of the Agreement or with Employee's faithful performance of his duties as an employee of Ancra.

(d)   Employee has not made any commitments on behalf of Ancra to any person or concern, including current employees of former employers, to provide employment to them at Ancra; nor has Employee solicited commitments for Ancra from any person or concern, including current employees of former employers, to seek employment by Ancra.

(e)   Employee has not used and shall not use any customer list(s) or any other information about customers, whether written or recollected, that is Proprietary to any of Employee's former employers for the purpose of soliciting business for Ancra.

(f)   Employee has not used and shall not use any drawing(s) or any other information about products, whether written or recollected, that is Proprietary to any of Employee's former employers for the purpose of developing products for Ancra.

(g)   Employee hereby agrees to indemnify and hold harmless Ancra for any loss or damages incurred by Ancra as a result of Employee's breach of

2

representations set forth in this paragraph, including court costs and reasonable attorney's fees.

(h)     In reliance and conditioned upon the validity of the representations and warranties made by Employee in this Agreement, Ancra hereby agrees to indemnify and hold harmless Employee for the costs of defense and other losses, if any, incurred by Employee as a result of a claim by a former employer of Employee that Employee has breached an agreement or other legal obligation to such prior employer by entering into and performing the terms of this Agreement; provided that Employee must provide Ancra prompt notice of any claim for which Employee seeks indemnification of the costs of defense and that Employee must cooperate with Ancra regarding the defense of such claim. The foregoing conditional indemnification shall survive the termination of this Agreement if the termination is for the convenience of Ancra and not due to performance or any other cause, an invalid representation or warranty, death or disability.

Employee acknowledges that Ancra will reasonably rely on the foregoing representations and warranties by Employee without additional or independent investigation.

5.     RESPONSIBILITY AND AUTHORITY:

Employee is hereby engaged as National Sales Manager, Cargo Control, with duties including, but not limited to: plans and manages the National sales effort for core cargo control products including management responsibility for both inside and outside sales force; maintains contact with key accounts within the region; confers with General Manager, Cargo Systems Division in the development of a marketing policy, recommending product and product/service line revisions as well as price changes; prepares annual regional sales forecasts and participates in the determination of market potential and in the preparation of sales expense estimates for the regions; selects and develops sales employees, distributors, dealers and other outlets, and takes responsibility for the recruitment, selection, training, and performance measurement of the sales personnel within the organization; directs sales planning which includes an analysis of competitive products and selling techniques, customer research, marketing legislation, sales budgets, quota, pricing and delivery; and such other projects Ancra may assign to Employee from time to time, provided that Ancra shall have the right to assign such projects to other personnel in its discretion.

6.     EXPENSES:

Employee is authorized to incur customary, ordinary and reasonable expenses for promoting the business of Ancra and maintaining and improving his professional status, including reasonable expenses for entertainment and travel in accordance with Ancra's then applicable policies and practices. Ancra shall reimburse Employee for such expenses upon presentation by Employee from time to time of an itemized statement of such expenditures, which itemized statements shall comply with the Internal Revenue Service requirements relating to ordinary and necessary business expenses.

3

7.   OTHER BENEFITS:

   (a)   During the term of Employee's Employment by Ancra, Employee shall be entitled to three (3) weeks of vacation leave per year during which time Base Compensation shall be paid in full. Vacation leave not used during the year of entitlement may be carried forward to a subsequent year only in accordance with Ancra's vacation leave policy in effect at the time.

   (b)   Employee shall be entitled to a reasonable number of days of sick leave, as established by the policy set by Ancra, due to personal illness or accident during each year.

8.   INSURANCE:

   Ancra shall provide Employee and his dependents with such medical, disability and hospitalization insurance policies as shall be approved from time to time by Ancra. In addition, Ancra shall provide Employee with life insurance, with beneficiary to be determined by Employee.

9.   TERMINATION:

   (a)   Either party may terminate the Employment and this Agreement at any time, with or without cause.

   (b)   This Agreement shall terminate automatically upon the death of Employee.

10.   PROPRIETARY INFORMATION AND INVENTIONS:

   (a)   For purposes of this Agreement, "Proprietary Information" shall mean information not generally available to the public that has been created, discovered, developed, or otherwise become known to Ancra or in which property rights have been assigned or otherwise conveyed to Ancra, which information has material economic value or potential material economic value to the business in which Ancra is or will be engaged. Proprietary Information shall include, but not be limited to, trade secrets, processes, formulas, data, know-how, negative know-how, improvements, discoveries, developments, designs, inventions, techniques, all technical data, customer and supplier lists, and any modifications or enhancements thereto, software programs, and information (whether or not necessarily in writing) which has actual or potential economic value to Ancra.

   (b)   For purposes of this Agreement "Invention(s)" shall mean all discoveries, developments, designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, negative know-how, and data, whether or not patentable or registrable under patent, copyright or similar statues, that are related to or useful in the business or future business of Ancra. Without limiting the generality of the foregoing, "Invention(s)" shall

4

also include anything that derives actual or potential economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. "Invention(s)" shall not include any development conceived by Employee for which no equipment, supplies, facility or trade secret information of Ancra was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of Ancra, or (ii) to Ancra's actual or demonstrably anticipated research or development; or (b) the invention results from any work performed by Employee for Ancra.

(c)     All Proprietary Information and Inventions shall be the sole property of Ancra and Ancra shall be the sole owner of all Proprietary Information and Inventions. Employee hereby assigns to Ancra any rights Employee may have or acquire in Proprietary Information or Inventions. Employee further agrees as to all Proprietary Information or Inventions to assist Ancra or any person designated by it in every proper way (at Ancra's expense) to obtain and from time to time enforce any rights relating to said Proprietary Information or Inventions. Employee's obligation to assist Ancra or any person designated by it in obtaining and enforcing rights relating to Proprietary Information or Inventions shall continue beyond the cessation of Employee's Employment, but Ancra shall compensate Employee at a reasonable rate after the cessation of the Employment for time actually spent by Employee upon Ancra's request for such assistance.

(d)     Employee will promptly disclose to Ancra, and Ancra hereby agrees to receive such disclosures in confidence, all discoveries, developments, designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, negative know-how and data (whether or not patentable or registrable under patent, copyright, or similar statues) made or conceived or reduced to practice or learned by Employee, either alone or jointly with others during the period of his Employment. For the purpose of permitting the accurate disclosures described above, Employee agrees to maintain complete written records of all Inventions, and of all work, study and investigation done by Employee during his Employment, which records shall be the property of Ancra.

(e)     At all times, both during the Employment and after the cessation of the Employment, whether the cessation is voluntary or involuntary for any reason, or by disability, Employee will keep in strictest confidence and trust all Proprietary Information, and Employee will not disclose, use, or induce or assist in the use or disclosure of any Proprietary Information without the prior express written consent of Ancra, except as may be necessary in the ordinary course of performing Employee's duties as an employee of Ancra. Employee recognize that Ancra has received and in the future will receive from third parties their confidential or proprietary information subject to the duty on Ancra's part to maintain confidentiality of such information and to use it only

5

for certain limited purposes. Employee agrees that Employee owes Ancra and such third parties, during the Employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence, and Employee will not disclose, use or induce or assist in the use or disclosure of any such confidential or proprietary information without the prior express written consent of Ancra, except as may be necessary in the ordinary course of performing Employee's duties as an employee of Ancra consistent with Ancra's agreement with such third party.

(f)     In the event of the cessation of the Employment, Employee will deliver to Ancra all devices, records, sketches, reports, proposals, lists, correspondence, equipment, documents, photographs, negatives, undeveloped film, notes, drawings, specifications, tape recordings or other electronic recordings, programs, data and other materials or property of any nature belonging to Ancra or pertaining to Employee's work with Ancra, and Employee will not take with him, or allow a third party to take, any of the foregoing or any reproduction of any of the foregoing.

(g)     Employee represents and warrants to Ancra that Employee has not brought and will not bring with Employee to Ancra or use in the Employment any material or documents belonging to a "former employer" (which term, for purposes of this paragraph, shall include all persons, firms, corporations and other entities for which Employee have acted as an independent contractor or consultant) that are not generally available to the public, unless Employee has obtained express written authorization from any such former employer.

11.    NONCOMPETITION AND NONSOLICITATION:

During the Employment, Employee will not directly or indirectly engage in any activity that Ancra shall determine in good faith to be in competition with Ancra.

12.    ENFORCEMENT:

Employee acknowledges that, for the breach of any of the covenants contained in this Agreement, and particularly Paragraphs 10 or 11, Ancra will suffer irreparable damages for which the remedy at law will be inadequate, and that an injunction may be entered against Employee by any court having jurisdiction, restraining Employee from breaching or continuing the breach. Employee consents to the personal jurisdiction of the Cook County, Illinois, and the United States District Court for the Northern District of Illinois for purposes of enforcement of this Agreement, and particularly Paragraphs 10 or 11. Resort to such equitable relief, however, shall not be construed to be a waiver by Ancra of any other rights or remedies that Ancra may have for damages or otherwise. Should a court determine that either the territory covered by the covenants in Paragraphs 10 or 11 is unreasonably extensive or the period of the covenants in Paragraphs 10 or 11 is unreasonably long, it may amend the terms of such covenants so as to make such covenants reasonable and enforceable.

6

13.    SEVERABILITY:

The covenants and provisions of this Agreement are severable. Ancra and the Employee agree that the restrictions imposed herein are reasonably necessary to protect the legitimate business interests of Ancra. However, if any provision or covenant of this Agreement were held to be unenforceable as written, then Ancra and the Employee agree that the provision or covenant shall be construed in order that it shall be enforced to the greatest extent possible and, if such construction and enforcement is not possible, then the remainder of this Agreement shall be enforced as if such invalid covenant or provision were not contained in this Agreement.

14.    MODIFICATION:

This Agreement cannot be changed, modified, or discharged other than by an agreement in writing signed by Ancra and the Employee.

15.    SURVIVAL AND BENEFIT:

Except as otherwise herein expressly provided, this Agreement shall inure to the benefit of and be binding upon Ancra, its successor and assigns, including, but not limited to, any corporation which may acquire all, or substantially all, of Ancra's assets or business or with which Ancra may be consolidated or merged. The parties agree that the responsibility for the performance of Employee's duties hereunder may not be delegated. The covenants, undertakings and acknowledgments contained in Paragraphs 10 or 11 shall survive the termination of this Agreement.

16.    INTERPRETATION AND JURISDICTION:

This Agreement shall be interpreted under and pursuant to the laws of the State of Illinois without regard to its choice of law rules. Employee agrees that the courts located in Illinois shall have exclusive jurisdiction to enforce any of the terms of this Agreement and/or to resolve any dispute which arises under this Agreement and Employee hereby consents to and submits to the jurisdiction of such courts over his person for purposes of enforcing any terms of this Agreement or resolving any disputes which arise under this Agreement.

17.     NOTICES:

All notices hereunder shall be in writing and shall be deemed given when delivered by personal delivery (with receipt therefor) or by certified mail, return receipt requested, first class postage prepaid, addressed to the parties at their following respective addresses, or at such other address as may be designated in writing by either party to the other:

> If to Employee:
>> Ralph Abato
>> 29 Ten Acre Road
>> New Britain, CT  06052

> If to Ancra:
>> Steven M. Frediani
>> Ancra International LLC
>> 4880 West Rosecrans Avenue
>> Hawthorne, CA 90250

18.     ENTIRE AGREEMENT:

Employee has read all of this Agreement and understands it completely, and by Employee's signature below Employee represents that this Agreement is the only statement made by or on behalf of Ancra upon which Employee has relied in signing this Agreement.


ANCRA INTERNATIONAL LLC

By:  _Steven M. Frediani_

Its:____President & CEO____          _____Ralph Abato_____

8

# EXHIBIT F

## EMPLOYEE PROPRIETARY INFORMATION
## AND INVENTIONS AGREEMENT

I recognize that Ancra International LLC, is engaged in a continuous program of research, development, design and production respecting its business, present and future.

I understand that as part of my employment by the Company ("Employment"), I am (or may be) expected to make new contributions and inventions of value to the Company. I further understand that my Employment by the Company creates in me a duty of trust and confidentiality to the Company with respect to any information: (1) related, applicable or useful to the business of the Company, including the Company's anticipated research and development; or (2) resulting from tasks assigned to me by the Company; or (3) resulting from the use of equipment, supplies or facilities of the Company; or (4) related, applicable or useful to the business of any client or customer of the Company, which may be known to me by the Company or by any client or customer of the Company, or learned by me during the period of my employment.

As part of the consideration for my Employment, by the Company, and the compensation received by me from the Company from time to time, I hereby agree as follows:

1.  All Proprietary Information and Inventions (as defined on Exhibit A hereto) shall be the sole property of the Company and the Company shall be the sole owner of all Proprietary Information and Inventions. I hereby assign and agree to assign to the Company any and all rights I may have or acquire in Proprietary Information or Inventions. I further agree as to all Proprietary Information or Inventions to assist the Company or any person designated by it in every proper way (at the Company's expense) during and after employment to obtain and from time to time enforce any rights relating to said Proprietary Information or Inventions. My obligation to assist the Company or any person designated by it during and after employment in obtaining and enforcing rights relating to Proprietary Information or Inventions, including the prompt execution of all lawful documents reasonable and necessary to obtain intellectual property and giving testimony as reasonably requested by the Company, shall continue beyond the Cessation of my Employment, but the Company shall compensate me at a reasonable rate after the Cessation of my Employment for time actually spent by me upon the Company's request for such assistance.

2.  I will promptly disclose to the Company, and the Company hereby agrees to receive such disclosures in confidence, all discoveries, developments, designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, negative know-how, trademarks, service marks and data, whether or not patentable or registrable under patent, trademark, copyright, mask work or similar statues or reduced to practice, made or conceived or reduced to practice or learned by me, either along or jointly with others during the period of my Employment. Any original works of authorship fixed in any tangible form, prepared by me (alone or jointly with others) within the scope of my Employment, shall be deemed a "work for hire" under the copyright laws and shall be owned by the Company. I understand that any assignment or release of such works can only be made by the Company. For the purpose of permitting the accurate disclosures described above, I agree to maintain complete and accurate records in a permanent suitable media, such as writing, of all Inventions, and of all work, study and investigation done by me during my Employment, which records shall be the property of the Company.

**EMPLOYEE PROPRIETARY INFORMATION**
**AND INVENTIONS AGREEMENT**
**Page 2 of 4**

3. At all times, both during my Employment and after the Cessation of my Employment, whether the Cessation is voluntary or involuntary for any reason or no reason, or by disability, I will keep in the strictest confidence and trust all Proprietary Information, and I will not disclose, use, or induce or assist in the use or disclosure of any Proprietary Information without the prior express written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty of the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree that I owe the Company and such third parties, during my Employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence, and I will not disclose, use, or induce or assist in the use or disclosure of any such confidential or proprietary information without the prior express written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company consistent with the Company's agreement with such third party. I UNDERSTAND AND AGREE THAT, AS FURTHER PROVIDED FOR HEREIN, THIS CLAUSE SHALL CONTINUE IN FULL FORCE AND EFFECT AFTER TERMINATION OF MY EMPLOYMENT.

4. During the period of my Employment, I will not directly or indirectly engage in any activity which the Company shall determine in good faith to be in competition with the Company. During any Employment and for a period of two (2) years after Cessation of my Employment, I will not, either directly or indirectly, either alone or in concert with others, solicit or entice any employee of or consultant to the Company to leave the Company or work for anyone in competition with the Company or solicit, entice or in any way divert any customer or supplier to do business with any business entity in competition with the Company. During my Employment, I agree not to plan or otherwise take any preliminary steps, either alone or in concert with others, to set up or engage in any business enterprise that would be in competition with the Company.

5. In the event of the Cessation of my Employment, I will deliver to the Company all devices, records, sketches, reports, proposals, lists, correspondence, equipment, documents, photographs, photostats, negatives, undeveloped film, notes drawings, specifications, tape recordings or other electronic recordings, programs, data and other materials or property of any nature belonging to the Company or pertaining to my work with the Company, and I will not take with me, or allow a third party to take, any of the foregoing or any reproduction of any of the foregoing.

6. I agree not to engineer or analyze, to have engineered or analyzed, or in any other manner, individually or by a third party to conduct reverse analysis or engineering of any products or services of the Company which use any Proprietary Information and/or Inventions of the Company. Further, I agree not to enter any development agreements with any third parties to develop any products or services of the Company using the Proprietary Information and/or Inventions without the express written permission from the Company.

**EMPLOYEE PROPRIETARY INFORMATION
AND INVENTIONS AGREEMENT
Page 3 of 4**

7.  I represent and warrant the Company that I have not brought and will not bring with me to the Company or use in my Employment any materials or documents of a "former employer" (which term, for purposes of this paragraph 7, shall also include persons, firms, corporations and other entities for which I have acted as an independent contractor or consultant) that are not generally available to the public, unless I have obtained express written authorization from any such former employer.

8.  This Agreement shall be governed by and construed in accordance with the laws of the State of California and any action shall be brought in California except as to any provisions herein that are governed primarily by the laws of the United States of America, in which case the latter laws shall govern.

9.  I hereby waive any right to a jury trial in any proceeding regarding any and all disputes, disagreements or the like which may occur, arise or otherwise be pursuant to or under this Agreement.

10. I represent and warrant that I am not a party to any existing contract relating to the granting or assignment to others of any interest in inventions, confidential information, copyright works and mask works hereafter made by me except insofar as copies of such contracts, if any, are attached to this Agreement.

11. I agree that the Company shall be entitled to shop rights providing the Company  a non-exclusive, royalty-free and irrevocable (although non-transferable and non-assignable) license to make, use and sell any invention or other protectable development (whether patentable or not) conceived or made or authored by me which is not within the scope of the above meaning of the terms "invention", "confidential information", "copyright works", or "mask works", but which was conceived or made or authored on the time of the Company or with the use of the facilities or materials of the Company or with the use of Proprietary Information of the Company.

12. I have read all of this Agreement and understand it completely, and by my signature below, I represent that this Agreement is the only statement made by or on behalf of the Company upon which I have relied in signing this Agreement.

13. This Agreement shall be effective as of the first day of my being retained to render services to the Company, namely:

Date of Employment:    6-7-00

Dated:    6-9-00                                    _____
                                                    Employee Signature

                                        ANCRA INTERNATIONAL LLC

                                        By: _____
                                                    President

EMPLOYEE PROPRIETARY INFORMATION
AND INVENTIONS AGREEMENT
Page 4 of 4

EXHIBIT A

to

EMPLOYEE PROPRIETARY INFORMATION
AND INVENTIONS AGREEMENT

"Proprietary Information" Defined:

For the purposes of this Agreement, "Proprietary Information" shall mean information generally unavailable to the public that has been created, discovered, developed, or otherwise become known to the Company or in which property rights have been assigned or otherwise conveyed to the Company, which information has material economic value or potential material economic value to the business in which the Company is or will be engaged. Proprietary Information shall include, but not be limited to, trade secrets, processes, formulas, data, know-how, negative know-how, improvements, discoveries, developments, designs, inventions, techniques, all technical data, customer and supplier lists, and any modifications or enhancements thereto, software programs, and information (whether or not necessarily in writing) which has actual or potential economic value to the Company.

"Invention(s)" Defined:

For the purpose of this Agreement, "Invention(s)" shall mean all discoveries, developments designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, negative know-how, and data, whether or not patentable or registrable under patent, copyright or similar statutes, that are related to or useful in the business or future business of the Company. Without limiting the generality of the foregoing, "Invention(s)" shall also include anything that derives actual or potential economic value from not being generally known to the public or to the other persons who can obtain economic value from its disclosure or use.

# EXHIBIT G

# THE **HEICO** COMPANIES L.L.C.

2626 WARRENVILLE ROAD
DOWNERS GROVE, ILLINOIS  60515

(630) 353-5100

JEREMY STEELE
CHIEF COUNSEL & DIRECTOR OF CORPORATE COMPLIANCE

March 5, 2012

*Via E-Mail and Overnight Courier*

Ralph Abato
29 Ten Acre Rd
New Britain, CT  06052

Re:     Confidential, Proprietary and Trade Secret Information of Ancra International, LLC

Dear Mr. Abato:                        •

I am writing to you on behalf of your former employer, Ancra International, LLC (hereinafter "Ancra").  I understand that were employed by Ancra, as Vice President, International Sales, Ancra Cargo Control Division, and that you resigned from employment as of Friday, March 2, 2012.  I further understand that Ancra is concerned, and has reason to believe, that you have agreed to commence employment with a direct competitor of Ancra.

As an Ancra employee you were privy to Ancra's confidential and proprietary information, including information regarding, among other things, the Company's products, customers, suppliers, pricing and strategic plans.  At the outset of your employment, you signed an "Employee Proprietary Information and Inventions Agreement" as well as an "Employment Agreement" (the "Agreements").  As part of these Agreements, you specifically agreed that you would not misuse or disclose without authorization any confidential, proprietary and trade secret information. I have attached copies of the Agreements you signed for your reference.  Based upon your conduct and the conduct of others, we are concerned that you may have already breached the terms of your Agreements and/or that you may engage in such improper conduct in the future.

In signing the Employee Proprietary Information and Inventions Agreement you acknowledged that Ancra provided you with confidential and proprietary information and that you would hold such information in trust and confidence.

Specifically, you agreed that:

> 3.     At all times, both during my Employment and after the cessation of my Employment, ...I will keep in the strictest confidence and trust all Proprietary Information, and I will not disclose, use, or induce or assist in the use or disclosure of any Proprietary Information without the prior express written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company....I UNDERSTAND AND AGREE THAT, AS FURTHERPROVIDED FOR HEREIN, THIS CLAUSE SHALL CONTINUE IN FULL FORCE AND EFFECT AFTER TERMINATION OF MY EMPLOYMENT.

You further agreed that you would not, while employed, prepare to engage in competition with Ancra. You also agreed that you would not entice or encourage others to resign, nor would you solicit business from Ancra's customers. Specifically, you agreed:

> 4.     During the period of my Employment, I will not directly or indirectly engage in any activity which the Company shall determine in good faith to be in competition with the Company. During any Employment and for a period of two (2) years after the Cessation of my Employment,

Ralph Abato
March 5, 2012
Page 2

I will not directly or indirectly, either alone or in concert with others, solicit or entice any employee of or consultant to the Company to leave the Company or work for anyone in competition with the Company or solicit, entice or in any way divert any customer or supplier to do business with any business entity in competition with the Company. During my Employment, I agree not to plan or otherwise take any preliminary steps, either alone or in concert with others, to set up or engage in any business enterprise that would be in competition with the Company.

In both your Employment Agreement and the Employee Proprietary Information and Inventions Agreement, you acknowledged that "Proprietary Information" was defined as

[I]nformation generally unavailable to the public that has been created, discovered, developed, or otherwise become known to the Company, ...which information has material economic value or potential material economic value to the business in which the Company is or will be engaged. Proprietary Information shall include, but not be limited to, trade secrets, processes, formulas, data, know-how, negative know-how, improvements, discoveries, developments, designs, inventions, techniques, all technical data, customer and supplier lists, and any modifications or enhancements thereto, software programs, and information (whether or not necessarily in writing) which has actual or potential economic value to the Company.

Please confirm, in writing to my attention at The Heico Companies, LLC, 2626 Warrenville Road, #400, Downers Grove, IL 60515 or at jsteele@heicocompanies.com, within 5 business days of this letter, that (i) you have returned to Ancra all confidential and proprietary information, in whatever format, that is in your possession, custody or control, (ii) that you have not retained any such information nor divulged any confidential or proprietary information to anyone in violation of these Agreements and (iii) that you have not solicited or enticed, directly or indirectly, any employee, customer or supplier of Ancra to leave the Company or to work for a competitor of Ancra. Further, please confirm, in writing to my attention, that you will abide by your obligations to maintain all such confidential and proprietary information in confidence, that you will not use or disclose such information, that you will not solicit or entice employees, customers or suppliers of Ancra to do business with a competitor and that you will otherwise abide by the terms of these Agreements.

Please be advised that Ancra will take all necessary and appropriate actions to protect its confidential, proprietary and trade secret information. Ancra reserves all rights and remedies available to it under these Agreements, the Uniform Trade Secrets Act and various federal and state laws.

I look forward to your prompt response.

Regards,

Jeremy Steele
Chief Counsel & Director, Corporate Compliance


cc:    Steve Frediani
       Tom Leone
       Mark Daugherty

# EXHIBIT H

| From: | Ralph |
|---|---|
| To: | Jeremy Steele |
| Subject: | Re: Confidential, Proprietary and Trade Secret Information of Ancra International, LLC |
| Date: | Thursday, March 08, 2012 10:55:38 AM |

I received the agreements which you referenced in your letter dated March 5. I am writing you to confirm that I have returned to Ancra all company property as well as all confidential and proprietary information. Mr. Tom Leone should now be in receipt of those items. I also confirm that I will continue to comply with my confidentiality obligations.

Ralph

**From:** Jeremy Steele
**Sent:** Tuesday, March 06, 2012 5:44 PM
**To:** Ralph
**Subject:** RE: Confidential, Proprietary and Trade Secret Information of Ancra International, LLC

Mr. Abato,

Attached are copies of your Employee Proprietary Information and Inventions Agreement and your Employment Agreement.

I look forward to your prompt response to my letter.

Regards,

Jeremy Steele
Chief Counsel & Director of Compliance
jsteele@heicocompanies.com
The HEICO Companies, LLC
2626 Warrenville Road
Downers Grove, IL  60515
630-353-5015

NOTICE: This message, including any attachments, may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender and delete the message.

**From:** Ralph [mailto:ralphl@snet.net]
**Sent:** Tuesday, March 06, 2012 2:54 PM
**To:** Jeremy Steele
**Subject:** Re: Confidential, Proprietary and Trade Secret Information of Ancra International, LLC

I am in receipt of both the electronic and hard copy of this letter. I see no agreements referenced per your letter. Please advise.

Ralph Abato

860-225-4521

**From:** Jeremy Steele
**Sent:** Monday, March 05, 2012 6:17 PM
**To:** ralphi@snet.net
**Subject:** Confidential, Proprietary and Trade Secret Information of Ancra International, LLC

Mr. Abato,

Please see attached correspondence on behalf of Ancra International, LLC.

I look forward to your prompt response.

Jeremy Steele
Chief Counsel & Director of Compliance
jsteele@heicocompanies.com
The HEICO Companies, LLC
2626 Warrenville Road
Downers Grove, IL  60515
630-353-5015

NOTICE: This message, including any attachments, may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender and delete the message.

# EXHIBIT I



Littler Mendelson, P.C.
One Century Tower
265 Church Street
Suite 300
New Haven, CT 06510

March 16, 2012

Patricia Reilly
203.974.8703 direct
203.974.8700 main
203.907.1914 fax
preilly@littler.com

Ralph Abato
29 Ten Acre Road
New Britain, CT 06051

Re:  Confidential, Proprietary and Trade Secret Information of Ancra International, LLC

Dear Mr. Abato:

This firm represents Ancra International, LLC ("Ancra" or "the Company") in connection with your post-separation contractual, statutory and common law obligations to Ancra.  Please direct all future correspondence regarding this matter to my attention.

This letter follows the March 5, 2012 correspondence from Jeremy Steele, Chief Counsel & Director, Corporate Compliance of Helco to you regarding your continuing obligations under the "Employee Proprietary Information and Inventions Agreement" as well as your "Employment Agreement" (the "Agreements").

The Company appreciates your response to Mr. Steele's letter to the effect that you "have returned to Ancra all company property as well as all confidential and proprietary information. . . . [and] confirm that [you] will continue to comply with [your] confidentiality obligations."

However, your response fails to address your duty of loyalty to Ancra while employed as an executive and your obligations under Paragraph 4 of the Employee Proprietary Information and Inventions Agreement as follows:

> 4.      During the period of my Employment, I will not directly or indirectly engage in any activity which the Company shall determine in good faith to be in competition with the Company.  During any Employment and for a period of two (2) years after the Cessation of my Employment, I will not directly or indirectly, either alone or in concert with others, solicit or entice any employee of or consultant to the Company to leave the Company or work for anyone in competition with the Company or solicit, entice or in any

March 16, 2012
Page 2

way divert any customer or supplier to do business with any
business entity in competition with the Company. During my
Employment, I agree not to plan or otherwise take any
preliminary steps, either alone or in concert with others, to
set up or engage in any business enterprise that would be in
competition with the Company.

Please confirm in writing that you will not use and have not used, directly or indirectly,
Ancra's Proprietary Information in competition with Ancra. Please also confirm in
writing that you have not solicited or assisted, directly or indirectly, in the solicitation of
Ancra employees and/or customers.

Your failure to address this aspect of the Company's request for assurance in your first
response raises the inference that you have in fact used Ancra's Proprietary Information
in competition with Ancra (while employed or afterwards) or that you intend to do so.
Ancra will not hesitate to seek all available recourse to ensure your compliance with
your common law, contractual and statutory obligations.

In addition, upon information and belief, you have disclosed Ancra's Proprietary
Information to Ancra customers and you have circulated false and misleading
information about Ancra and its products to Ancra customers. We demand that you
cease and desist from such activity immediately.

You are hereby put on notice of anticipated litigation. Accordingly, you are also hereby
put on notice of your associated duty to preserve evidence, both electronic and
otherwise. Please preserve all computer (including, without limitation, email and
information stored on flash drives or other external media) and hard documents, data,
information, and/or reports relevant to this matter, including, but not limited to: all data
downloaded from your Ancra-issued laptop computer and transferred via email or
removable media, information pertaining to your current employment and information
pertaining to any contact, communications, or interactions with Ancra customers, both
before and after your termination of employment with Ancra.

In an effort to avoid any misunderstandings regarding your recent activities and to
expedite the conclusion of the investigation into possible misconduct, we request that
you provide a detailed, written description/explanation (including dates, purpose, and
witnesses) to us on or before March 21, 2012, regarding the following:

March 16, 2012
Page 3

     (a) Your transfer and attempted destruction of Ancra data, including but not limited to email communications, on your Ancra-issued laptop prior to termination of your employment by Ancra;

     (b) Communications, including but not limited to email and cellular communications, with other Ancra employees and Ancra customers regarding your intention to terminate your relationship with Ancra;

     (c) Your current employment, including duties and responsibilities; and

     (d) Any contact or interaction with Ancra customers since leaving Ancra and the nature of such contact or interaction, including any information regarding Ancra and its business and products that you disclosed.

We are hopeful that we can resolve this matter without the necessity of invoking the legal process. However, any violation of the Agreements or any use of Ancra's trade secret, confidential and proprietary information will not be tolerated and will result in the Company seeking all available relief, including equitable relief, attorneys' fees, and damages. Such claims may include but are not limited to violations of the Connecticut Uniform Trade Secrets Act, Connecticut Unfair Trade Practices Act, the Economic Espionage Act, breach of contract, breach of loyalty, tortious interference with contract and related common law claims.

I look forward to receiving your response.

Sincerely,

Patricia Reilly

PR

# EXHIBIT J

# THE HEICO COMPANIES L.L.C.

2828 WARRENVILLE ROAD
DOWNERS GROVE, ILLINOIS 60515

(630) 353-5100

JEREMY STEELE
CHIEF COUNSEL & DIRECTOR OF CORPORATE COMPLIANCE

March 8, 2012

*Via E-Mail and UPS*

James M. Klausmann, II
President
Kinedyne Corporation
151 Industrial Parkway
Branchburg, NJ 08876-3451

Amy Bellerive
Human Resources Manager
Kinedyne Corporation
151 Industrial Parkway
Branchburg, NJ 08876-3451

Re:     Confidential, Proprietary and Trade Secret Information of Ancra International, LLC

Dear Mr. Klausmann and Ms. Bellerive:

I am Chief Counsel for The Heico Companies, LLC, the parent company of Ancra International, LLC. Within the last week, three employees, Vice President of International Sales, Ralph Abato, Manager of Process Improvement, Mark Arnold, and Director of Engineered Solutions, Paul Wolford, resigned from their employment with Ancra. We have reason to believe that each of these three individuals have been hired by Kinedyne Corporation.

As is apparent from their positions, these individuals were privy to and entrusted with substantial confidential, proprietary and trade secret information, including, among other things, information regarding Ancra's products, customers, suppliers, pricing and strategic plans. As a condition of their employment, each of these individuals specifically agreed that they would not disclose such information without authorization nor use such information to compete with Ancra during their employment or for a period of two years following their employment.

Specifically, each of the foregoing individuals agreed that:

> At all times, both during my Employment and after the cessation of my Employment, ...I will keep in the strictest confidence and trust all Proprietary Information, and I will not disclose, use, or induce or assist in the use or disclosure of any Proprietary Information without the prior express written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company....I UNDERSTAND AND AGREE THAT, AS FURTHER PROVIDED FOR HEREIN, THIS CLAUSE SHALL CONTINUE IN FULL FORCE AND EFFECT AFTER TERMINATION OF MY EMPLOYMENT.

James Klausmann
Amy Bellerive
March 8, 2012
Page 2

They further agreed that they would not, while employed, prepare to engage in competition with Ancra. They also agreed that they would not entice or encourage others to resign, nor would they solicit business from Ancra's customers. Specifically, each of these individuals agreement that:

> During the period of my Employment, I will not directly or indirectly engage in any activity which the Company shall determine in good faith to be in competition with the Company. During any Employment and for a period of two (2) years after the Cessation of my Employment, I will not directly or indirectly, either alone or in concert with others, solicit or entice any employee of or consultant to the Company to leave the Company or work for anyone in competition with the Company or solicit, entice or in any way divert any customer or supplier to do business with any business entity in competition with the Company. During my Employment, I agree not to plan or otherwise take any preliminary steps, either alone or in concert with others, to set up or engage in any business enterprise that would be in competition with the Company.

For the purposes of these agreements, the term "Proprietary Information" was defined as

> [I]nformation generally unavailable to the public that has been created, discovered, developed, or otherwise become known to the Company, ...which information has material economic value or potential material economic value to the business in which the Company is or will be engaged. Proprietary Information shall include, but not be limited to, trade secrets, processes, formulas, data, know-how, negative know-how, improvements, discoveries, developments, designs, inventions, techniques, all technical data, customer and supplier lists, and any modifications or enhancements thereto, software programs, and information (whether or not necessarily in writing) which has actual or potential economic value to the Company.

As noted above, we have reason to believe that Mr. Abato, Mr. Arnold and Mr. Wolford have been hired by your company. We are concerned that these individuals have already violated the terms of their agreements with and obligations to Ancra. Further, we are concerned that these individuals may yet engage in conduct that will violate their obligations to Ancra, which violations may irreparably harm Heico and Ancra.

We have asked Mr. Abato, Mr. Arnold and Mr. Wolford to confirm to me in writing that they (i) have returned to Ancra all confidential and proprietary information, in whatever format, that is in their possession, custody or control, (ii) have not retained any such information nor divulged any confidential or proprietary information to anyone in violation of their agreements and (iii) have not solicited or enticed, directly or indirectly, any employee, customer or supplier of Ancra to leave Ancra or to work for a competitor of Ancra. We have further asked Mr. Abato, Mr. Arnold and Mr. Wolford to confirm that they will abide by their obligations to maintain all such confidential and proprietary information in confidence, that they will not use or disclose such information, that they will not solicit or entice employees, customers or suppliers of Ancra to do business with a competitor and that they will otherwise abide by the terms of their agreements. Thus far, none of three has fully complied with these requests. Further, we believe that if these individuals accept employment performing similar functions for Kinedyne, they would necessarily disclose Ancra's confidential, proprietary and trade secret

James Klausmann
Amy Bellerive
March 8, 2012
Page 3

information.  Such "inevitable disclosure" would violate both their written agreements as well as the
Uniform Trade Secrets Act.

While Heico and Ancra are not anxious to engage in unnecessary litigation, misappropriation of our
confidential, proprietary and trade secret information is extremely serious and cannot be permitted.
Accordingly, please confirm that Kinedyne is not aware of any violation of Ancra's rights.  Further, please
confirm that Kinedyne will not employ Mr. Abato, Mr. Arnold and/or Mr. Wolford in any capacity which
would permit any of them to utilize Ancra's confidential, proprietary and trade secret information or to
otherwise violate the terms of their agreements and obligations to Ancra, and Kinedyne will not accept
or allow the disclosure or use of Ancra's confidential, proprietary and trade secret information in any
manner or for any purpose.

Please feel free to contact me if you would like to discuss this matter further.  I look forward to your
response.

Regards,

Jeremy Steele
Chief Counsel & Director, Corporate Compliance

cc:     Steve Frediani
        Tom Leone
        Mark Daugherty





March 14, 2012

Via e-mail and regular mail

Jeremy Steele
Chief Counsel & Director of Corporate Compliance
The HEICO Companies, LLC
2626 Warrenville Road
Downers Grove, IL 60515

Dear Mr. Steele:

In response to your request to our legal counsel, Kinedyne takes very seriously the protection of its own confidential information and that of others. Upon the hiring of Messrs. Abato, Wolford and Arnold each were told verbally that we expected that they were to honor any existing confidentiality provisions covering information that is not otherwise publicly available. Further, we had them confirm this responsibility to us in writing as a condition of their employment with us. Lastly, we communicated to our relevant employees the fact that these three employees had certain responsibilities to protect confidential information of their previous employer.

We hope that Ancra takes the same sound business measures to protect the information of prior employers of its employees including, but not limited to, former Kinedyne employees with whom Kinedyne has signed confidentiality agreements such as Jim Calico.

Sincerely,

James M. Klausmann II
Executive Vice President

cc:    Amy E. Bellerive, PHR

☐ Kinedyne Corporation
151 Industrial Parkway
Branchburg, NJ 08876-3451
Tel: 908-231-1800
Fax: 908-231-1379

☐ Kinedyne Corporation
1104 Washington Ferry Rd.
Prattville, AL 36067-4849
Tel: 334-365-2919
Fax: 334-361-1665

☐ Kinedyne Corporation
3701 Greenway Circle
Lawrence, KS 66046-5442
Tel: 785-841-4000
Fax: 785-841-3668

☐ Kinedyne Corporation
640 Maestro Dr., Suite 102
Reno, NV 89511-2207
Tel: 775-853-1888
Fax: 775-851-2067

☐ Kinedyne Canada Limited
160 Dynamic Drive
Toronto, Ontario M1V 5A5
Tel: 416-291-7168
Fax: 416-291-0814